[No. A027344. First Dist., Div. Five. Oct. 1, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID JESSE OLIVAS, Defendant and Appellant.

**COUNSEL**

Laurance S. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Kristofer Jorstad and Mark S. Howell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KING, J.**—David Jesse Olivas appeals from a judgment of conviction for second degree murder (Pen. Code, § 187) arising from a vehicular homicide committed under the influence of phencyclidine (PCP). We hold the evidence was sufficient to support the murder conviction, and affirm the judgment.

On October 12, 1983, Olivas led San Jose police on a high speed automobile chase which ended in a collision causing the death of an infant and serious injury to the infant's mother. Olivas was driving a new Oldsmobile which had been stolen earlier that day from an automobile dealership. At around 6:10 p.m. a police officer using radar observed Olivas driving 49 miles per hour (m.p.h.) in a 30 m.p.h. zone. The officer pursued, and Olivas increased his speed, commencing a chase which covered 1.9 miles in two and a half minutes.

Two police cars were involved in the chase. Olivas reached speeds between 50 m.p.h. and 100 m.p.h. on city streets with speed limits of 25 m.p.h. and 30 m.p.h. He ran four stop signs and three red lights. At the beginning of the chase he lost control of the car while attempting a turn and struck the fender of a car which had stopped in response to the police siren and lights. He narrowly missed a collision with two other cars when he ran the first red light. One of the officers used his police car to block Olivas's path, and also attempted to disable Olivas's car by "tapping it slightly" with his own car, but Olivas evaded both maneuvers.

The chase ended when Olivas ran a stop sign while traveling 57 m.p.h. in a 25 m.p.h. zone and struck a vehicle broadside. The car was driven by Lorraine Martinez, who was two months pregnant. Her nine-month-old child, William Martinez, Jr., was strapped in an infant seat. William was killed in the collision. Lorraine sustained serious injuries to her bladder, spleen, bowel, pelvis, and head, and suffered a miscarriage. She was hospitalized for a month.

A blood sample taken from Olivas at 7:54 p.m. was found to contain .02 percent blood alcohol and .04 parts per million of PCP. His eyes exhibited horizontal and vertical nystagmus (a jerky eye movement), which is indicative of PCP use.

An information charged Olivas with murder (Pen. Code, § 187), vehicular manslaughter (Pen. Code, § 192, subd. 3), driving under the influence and causing death (Veh. Code, § 23153), driving under the influence and causing injury (Veh. Code, § 23153), and driving or taking a vehicle without consent (Veh. Code, § 10851). The information also alleged four prior felony convictions (for burglary, grand theft, receiving stolen property, and driving or taking a vehicle without consent). An amended information added an allegation of a prior prison term under Penal Code section 667.5, subdivision (b), for driving or taking a vehicle without consent. Olivas waived a jury trial in exchange for the promise of a maximum prison term of no more than 15 years to life.

The court found Olivas guilty on all five counts, declaring the murder to be in the second degree. Olivas admitted three of the prior felony allegations. The court sentenced him to a term of 15 years to life for murder and stayed sentencing on all remaining matters.

Olivas challenges the sufficiency of the evidence to support the second degree murder conviction. The applicable law is set forth in *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279], in which the California Supreme Court described when a vehicular homicide committed while intoxicated may be found to be second degree murder rather than vehicular manslaughter.

Defendant Watson had driven to a bar and consumed large quantities of beer. After leaving the bar he drove through a red light and avoided a collision with another car only by skidding to a halt. He then drove away at high speed, reaching a speed of 84 m.p.h. He applied his brakes at another intersection, slowing to 70 m.p.h., but struck a car, killing two people. Watson's blood alcohol level one-half hour after the collision was .23 percent. An information charged him with two counts of second degree murder, but the trial court dismissed the murder counts. On a People's appeal the Supreme Court reversed the dismissal order, holding that there was sufficient evidence of second degree murder. (*Id.*, at pp. 292-294.)

The Supreme Court explained that a vehicular homicide committed while intoxicated involves implied malice, and is thus second degree murder, if "a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life." (*Id.*, at p. 296.) The homicide is vehicular manslaughter if committed with gross negligence, which is "the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences." (*Id.*)

The distinction between "conscious disregard for life" and "conscious indifference to the consequences" is subtle but nevertheless logical. Phrased

in everyday language, the state of mind of a person who acts with conscious disregard for life is, "I know my conduct is dangerous to others, but I don't care if someone is hurt or killed." The state of mind of the person who acts with conscious indifferences to the consequences is simply, "I don't care what happens." It makes sense to hold the former more culpable than the latter, since only the former is actually aware of the risk created.

In *Watson* the court held that the following evidence, in combination, was sufficient to support a finding that the defendant had acted with conscious disregard for life: (1) the defendant had consumed enough alcohol to impair his physical and mental faculties, knowing he would have to drive later, and presumably was aware of the hazards of driving while intoxicated; (2) the defendant had driven at high speeds on city streets, creating a great risk of harm or death; and (3) the defendant was aware of the risk, as shown by the near collision and by the belated attempt to brake before the fatal collision. (*Id.*, at pp. 300-301.)

Olivas contends the opinion in *Watson* creates two requirements for a determination that a vehicular homicide is second degree murder: (1) the defendant planned to be in a situation in which he would drive with gross negligence (e.g., he drove to a bar knowing that he would drive home while intoxicated), and (2) before the accident the defendant had a near fatal close call but chose to continue driving. Olivas argues that neither of these factors is present here, because there was no evidence as to how he came to be driving the car, and because the preaccident collision was not near fatal but was merely a "fender bender."

This argument is flawed in two respects. First, the preaccident collision may have been minor, but it was certainly sufficient to apprise Olivas of the risk he was creating. Indeed, it is arguable that the risk awareness was even greater here than in *Watson;* unlike in *Watson*, Olivas was unable to avoid the warning collision, leaving no doubt as to the danger involved. Olivas was further apprised of the risk when he nearly collided with two more cars while running the first red light.

Second, nowhere does the opinion in *Watson* state that all of the factors present in that case are necessary to a finding of second degree murder. Rather, the opinion states that the presence of those factors was sufficient *in that case* to support a murder conviction. While there is no evidence that Olivas took PCP knowing he would subsequently drive, nothing in *Watson* states that this alone precludes a finding of second degree murder. The criminal act underlying vehicular murder is not use of intoxicating substances in anticipation of driving, but is driving under the influ-

ence with conscious disregard for life. Nothing in *Watson* states that the former is necessary to a finding of the latter.

One commentator has argued that a "major flaw" in *Watson* is the omission to state which (if any) of the factors present in that case are the *sine qua non* of implied malice. (Note, *People v. Watson: Drunk Driving Homicide—Murder or Enhanced Manslaughter?* (1983) 71 Cal.L.Rev. 1298, 1310.) Olivas argues that *Watson* must be read very strictly to require all of those factors for a second degree murder conviction, in order to avoid unconstitutional vagueness in the homicide statutes.

However, we read *Watson* as deliberately declining to prescribe a formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach. If the Supreme Court had intended the factors in *Watson* to be required in all cases for a second degree murder conviction, it presumably would have said so. Instead, the court simply described the distinction between vehicular manslaughter and vehicular second degree murder, and applied the law to the particular facts in that case. Admittedly the distinction drawn in *Watson* between the two offenses is so subtle that it could easily be lost in application without a checklist to follow. The case-by-case approach, however, is all the Supreme Court has given us.

 In the present case there was sufficient evidence of implied malice. Olivas had consumed a negligible amount of alcohol, but had consumed enough PCP to impair his physical and mental faculties. (A psychiatrist testified that a PCP level of .04 parts per million is "not terribly high but it is also not negligible.") He drove at extremely high speeds through city streets for a relatively lengthy period of time, creating a great risk to other drivers. He was aware of this risk (perhaps even more than the defendant in *Watson*), as shown by his collision with one car, his near collision with two other cars, and his deliberate avoidance of two pursuing police cars. He chose to continue his extremely dangerous driving even after the danger to the lives of others was demonstrated. The only element in *Watson* not present here is proof that Olivas took PCP knowing he would later drive. Given the remaining facts, this single absence of proof did not preclude a finding that at the time of the fatal accident Olivas was acting deliberately with conscious disregard for a known, life-threatening risk. 
 The trier of fact did not err in implying malice and convicting Olivas of second degree murder.[1]

---

[1]Olivas argues that the police violated their own departmental regulations by pursuing him at high speeds and attempting to disable his car, causing him to panic. This point, however, in no way changes the fact that Olivas chose to continue a demonstrably life-threatening course of conduct. Any impropriety in the conduct of the police does not mitigate the conduct chosen by Olivas in response.

Olivas also contends the court should have precluded the prosecutor from impeaching a defense witness with prior convictions. (See *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].) Any error, however, has been waived, because Olivas expressly withheld objection to such use of the priors. (*People* v. *Collie* (1981) 30 Cal.3d 43, 49 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776]; *People* v. *Stewart* (1983) 140 Cal.App.3d 11, 16 [189 Cal.Rptr. 141].)

The judgment is affirmed.

Low, P. J., and Haning, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 31, 1985.