Filed 1/7/16  P. v. Cole CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TOMMIE LEE COLE,<br><br>Defendant and Appellant. | B254915<br><br>(Los Angeles County<br>Super. Ct. No.  MA055457) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed.

Mark David Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

Defendant Tommie Lee Cole appeals from the judgment entered following his conviction by jury of two counts of murder arising from a drunk driving incident. Defendant contends the jury lacked sufficient evidence to find he had the implied malice necessary to support a conviction for second-degree murder. We affirm.

**FACTUAL AND PROCEDURAL HISTORY**

A. *Procedural Background*

Defendant was charged by information with two counts of murder (Penal Code §187, subd. (a), counts 1 and 3)[1], two counts of gross vehicular manslaughter while intoxicated (§191.5, subd. (a), counts 2 and 4), one count of driving under the influence (DUI) causing injury (Vehicle Code § 23153, subd. (a), count 5), and one count of driving with a blood alcohol content of 0.08 percent (Vehicle Code § 23153, subd. (b), count 6). The information also specially alleged that in the commission of counts five and six, defendant caused great bodily injury or death (§ 12022.7, subd. (a) and Vehicle Code § 23558) and had a blood alcohol content of 0.15 percent or more (Vehicle Code § 23578).

Jury trial began on February 10, 2014. On February 25, 2014, the jury found defendant guilty on all charges and found the special allegations true. Defendant was sentenced to a total term of 30 years to life, consisting of 15 years to life for each of counts one and three, to run consecutively. The sentences on all other counts were stayed pursuant to section 654. Defendant timely appealed.

B. *Evidence at Trial*

1. *2012 Accident and Investigation*

Early in the morning on February 26, 2012, 26-year-old Beau Fluker and 23-year-old Jeffrey Gilstrup finished their shifts at Walmart in Lancaster and headed home in

---

[1] All further statutory references herein are to the Penal Code unless otherwise indicated.

Fluker's 1999 Nissan Sentra. At about 2:25 a.m., as they proceeded eastbound on Avenue J and entered the intersection crossing 20th Street West, Fluker's car was hit "broadside" by defendant, who was driving his 1996 Ford Contour northbound on 20th Street West. The collision caused Fluker's car to spin to the curb and flip over, landing upside down on a fire hydrant. Both Fluker and Gilstrup were killed.

At the time of the accident, Dimitri Barros was working as a security guard, patrolling near the southwest corner of the intersection, when he heard a "loud bang." He saw a car flip over across the street and hit a fire hydrant while upside down. He also saw a second vehicle "coasting" toward the corner. Both cars landed near the northeast corner of the intersection. He ran to the first car and determined that the two occupants were nonresponsive.

Barros then ran to the second car and approached the driver's door. Defendant was sitting in the driver's seat, slumped over and unconscious. Barros determined that defendant had a pulse and attempted to rouse him. Defendant had a wound on his forehead. Barros asked defendant his name and if there was anyone he should contact. Defendant gave his name and said he "didn't have anybody to contact." Barros also asked defendant "if he had been drinking" because Barros "could smell the alcohol."[2] Barros then asked if defendant thought he was intoxicated. Defendant responded "yes" to both questions. Defendant further stated he thought his driver's license was suspended. While Barros was continuing to administer first aid to defendant, another man approached and said to defendant: "You just killed two people." According to Barros, defendant responded: "Oh, my gosh. I killed two people."

Barros testified that prior to the accident, he did not hear any other noises, such as horns or brakes. Deputy Brian Parks, from the Los Angeles County Sheriff's Department (LASD), investigated the scene of the accident and confirmed that there were no skid marks in the intersection prior to the point of impact. In the report of the accident, LASD

---

[2] Barros later testified that he was certain the smell of alcohol was coming from defendant's person, but was not sure if it was on defendant's breath.

investigators concluded that the contributing factors to the accident were that defendant was intoxicated and that he had run the red light in the intersection.

Defendant was transported to the emergency room for treatment of his injuries. LASD Deputy Lee Schriever conducted a DUI investigation of defendant at 3:51 a.m. that morning while defendant was at the hospital. Deputy Schriever testified that he could smell "the strong odor of an alcoholic beverage" emitting from defendant's person, that defendant's eyes were "bloodshot and watery," but his speech was "normal." Defendant told the deputy that he was driving southbound on 20th Street West (he later stated he was "confused" and corrected that direction to northbound) and "was doing 60 in a 40-mile-an-hour zone." Defendant stated that the light at the intersection was yellow and he was "trying to beat the yellow." Defendant reported that he had driven to a friend's residence, where he consumed five 12-ounce beers, a shot of tequila, and a shot of whiskey between the hours of 5:00 p.m. on February 25 and 1:15 a.m. on February 26, 2012. At the time of the accident, defendant was driving home from his friend's home. Defendant stated he was not tired at the time and did not feel the effects of the alcohol.

Deputy Schriever administered a preliminary alcohol screening test to defendant at 4:07 and 4:10 a.m. on February 26, 2012. Defendant's breath alcohol concentration measured 0.151 and 0.168 percent, respectively. Defendant's blood was also drawn at the hospital at 3:22 a.m.; the results showed a blood alcohol content of 0.21 percent. Based on that reading and defendant's weight of 150 to 160 pounds, LASD senior criminalist Juan Apodaca concluded that defendant had a blood alcohol content between 0.21 and 0.23 percent at the time of the accident, more than two and one half times the legal limit of 0.08. Apodaca opined that, at that level of intoxication, a person would be "impaired to a point where he was unable to operate a vehicle safely." Deputy Schriever arrested defendant and transported him to the LASD station once defendant was released from the hospital.

Deputy Jon White interviewed defendant at the sheriff's station around 11 a.m. on February 26, 2012. After advising defendant of his rights, Deputy White asked defendant

4

if he wanted to talk about what happened.  Defendant replied, "I . . . don't really know. . . . Like I said, I was heading northbound on 20th and next thing I know, I'm sittin' here talkin' to you."  Defendant stated he was driving home from a friend's apartment, where he had consumed six Budweiser beers between 6 p.m. and 2 a.m.  He did not remember the collision but recalled that the traffic light had been yellow and he was "trying to beat it."  Defendant stated that he did not feel as though he were under the influence of alcohol.  When asked whether he understood the dangers of drinking and driving and the potential consequences of injuring or killing someone, defendant responded that he "most definitely" did.  Defendant stated he was driving "somewhere around 60 miles an hour" and thought the speed limit was 45 miles per hour.  He was not aware of any other cars around, noting that "[s]o far as I could tell, it was a quiet night and I was trying to make it through the yellow."

Scientific analysis of the crash scene determined defendant's car was traveling 69.19 miles per hour at the time of the collision and Fluker's car was traveling 39.45 miles per hour.  Based on the timing and sequence of traffic lights at that intersection and the other information from the investigation, LASD traffic collision investigator detective Michael Politano concluded that defendant entered the intersection on a red light, while Fluker entered the intersection on a green light.  Jaime Bonifassi also testified that he was traveling southbound on West 20th Street and was about 200 feet north of the intersection when the southbound light turned red.  As he was slowing to stop at the red light, he saw the cars collide.[3]

---

[3] There was some evidence suggesting the possibility that the LASD's conclusion was incorrect, including that the northbound light (facing defendant) could have remained green briefly after the southbound light (facing Bonifassi) turned red, and that all of the lights in all directions were momentarily red at the same time.  Bonifassi also testified that he saw Fluker's car driving "really fast," and estimated the speed as between 60 to 70 miles per hour.

## 2. *Prior DUI Incident*

Defendant previously had been arrested for driving under the influence in April 2009. According to the arresting officer, defendant appeared to be "heavily intoxicated" - his speech was "severely slurred," his eyes were "bloodshot and watery," he "swayed back and forth," and had a "very strong odor of an alcoholic beverage emitting from his breath." According to defendant's statement at the scene, he left the Silver Spur Bar to drive home, drove about a block and was rear-ended by another car. The other driver "sped off" and defendant pulled his car over. Defendant told the officer that he had consumed two beers between 12:00 a.m. and 2:15 a.m. and that he did not feel the effects of the alcohol. Defendant's blood alcohol content was measured at 0.18 percent by preliminary breath test performed at 3:00 a.m., then at 0.21 percent by breathalyzer test at 3:30 a.m., over an hour after the accident.

The Department of Motor Vehicles conducted a driver safety hearing in September 2009 based on the April incident. Defendant testified at the hearing and denied driving prior to the collision. He claimed he realized he was too drunk to drive and was sitting in his vehicle to call a taxi when he was hit by the other car. The arresting officer also testified. The hearing examiner found the officer more credible and issued an order suspending defendant's license and requiring him to complete a three-month alcohol program. The criminal DUI charge, however, was ultimately dismissed.

When defendant applied to reinstate his driver's license in May 2009, the form contained a "Watson" advisement, warning that "it is extremely dangerous to human life to drive while under the influence of alcohol," and that if defendant drove while intoxicated "and as a result, a person is killed, [he could be] charged with murder." Defendant signed the form, certifying under penalty of perjury that he had read and understood its contents.

Defendant attended an alcohol program for six months between September 2010 and April 2011. While the dangers of drinking and driving were not a formal part of the curriculum, the subject came up when participants would discuss the consequences of

6

their drinking.  Defendant's counselor did not recall the subject coming up with respect to defendant's own experience.

## DISCUSSION

Defendant acknowledges that his actions were grossly negligent and therefore supported his conviction for vehicular manslaughter.  He argues, on the other hand, that there was insufficient evidence of implied malice to sustain his conviction for second degree murder.  Specifically, he claims that while a reasonable person in his position would have been aware of the dangerousness of his conduct, there was no evidence that he actually knew of the risk to human life as a result of his driving that night.  We disagree.

We review this issue under the substantial evidence rule, "resolving all conflicts in evidence and questions of credibility in favor of the verdict, and indulging every reasonable inference the jury could draw from the evidence.  [Citation.]"  (*People v. Autry* (1995) 37 Cal.App.4th 351, 358 (*Autry*).)  "Substantial evidence is 'evidence that is reasonable, credible, and of solid value-from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]'  [Citation.]"  (*People v. Allen* (2001) 86 Cal.App.4th 909, 913-914.)

In the seminal case of *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*), the California Supreme Court analyzed the circumstances under which homicide caused by a drunk driver may be prosecuted as second degree murder.  Second degree murder based on implied malice is established "when a person does ""'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life'". . . .'  [Citations.]"  (*Id*. at p. 300.)  A finding of implied malice thus "depends upon a determination that the defendant actually appreciated the risk involved, i.e., a subjective standard.  [Citation.]"  (*Id*. at pp. 296-297.)

By contrast, a drunk-driving homicide is vehicular manslaughter, not murder, if committed with gross negligence, which is "the exercise of so slight a degree of care as to

7

raise a presumption of conscious indifference to the consequences. [Citation.]" (*Id*. at p. 296.) As one court noted, "[t]he distinction between 'conscious disregard for life' and 'conscious indifference to the consequences' is subtle but nevertheless logical. Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' The state of mind of the person who acts with conscious indifference to the consequences is simply, 'I don't care what happens.' It makes sense to hold the former more culpable than the latter, since only the former is actually aware of the risk created." (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987-988 (*Olivas*).)

In *Watson*, the Supreme Court found the evidence sufficient to warrant a charge of second degree murder based on implied malice. Defendant had consumed enough alcohol to become legally intoxicated (.23 percent), drove his car "to the establishment where he had been drinking, and he must have known that he would have to drive it later. It also may be presumed that defendant was aware of the hazards of driving while intoxicated." (*Watson, supra*, 30 Cal.3d at p. 300.) The *Watson* court further relied on evidence that defendant "drove at highly excessive speeds through city streets, an act presenting a great risk of harm or death," that he "nearly collided with a vehicle after running a red light," and "thereafter resumed his excessive speed before colliding with the victims' car, and then belatedly again attempted to brake his car before the collision" to establish that the defendant had "an actual awareness of the great risk of harm which he had created." (*Id*. at p. 301.) The court concluded that "[i]n combination, these facts reasonably and readily support a conclusion that defendant acted wantonly and with a conscious disregard for human life." (*Ibid*.)

Since *Watson*, numerous California cases have upheld drunk driving murder convictions. (See, e.g., *Olivas, supra*, 172 Cal.App.3d 984; *People v. Albright* (1985) 173 Cal.App.3d 883; *People v. McCarnes* (1986) 179 Cal.App.3d 525; *People v. Brogna* (1988) 202 Cal.App.3d 700; *People v. Murray* (1990) 225 Cal.App.3d 734; *People v. David* (1991) 230 Cal.App.3d 1109; *Autry, supra*, 37 Cal.App.4th 351.) As "summarized

8

in *People v. Talamantes* (1992) 11 Cal.App.4th 968, 973, these cases have relied on some or all of the following factors in upholding such convictions:  (1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving."  (*Autry, supra,* 37 Cal.App.4th at p. 358.)

Strong evidence of all four factors is present here.  First, defendant was driving with a blood alcohol content between 0.21 and 0.23 percent at the time of the accident, more than two and one half times the legal limit.

Second, the evidence suggests defendant had a predrinking intent to drive.  He drove his vehicle to his friend's home, where he drank heavily, and then got back into his car to drive himself home.  No evidence indicated defendant planned or attempted to arrange for an alternate way home; thus the jury could reasonably infer a predrinking intent to drive.  (See, e.g., *People v. Talamantes, supra*, 11 Cal.App.4th at p. 973 ["Since appellant was driving alone at 4 a.m., it [was] a reasonable inference that when he 'left' wherever he had been drinking, his car was available and he had intended to drive it"]; *Watson, supra*, 30 Cal.3d at p. 300 [the defendant "had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later"].)

Third, there was substantial evidence defendant was aware of the hazards of driving while intoxicated.  He previously had been arrested for driving under the influence, resulting in suspension of his license.  He also had been required to take an alcohol abuse class and, when reapplying for his driver's license, had signed an acknowledgment that outlined the dangers of drinking and driving, including the possibility that he could be charged with murder if he killed someone while driving under the influence of alcohol.  Indeed, defendant himself challenged his prior DUI charge by claiming he knew he was too drunk to drive.  Further, defendant acknowledged that he understood the dangers and potential consequences of drinking and driving during his

9

post-accident interview. Based on this evidence, the jury could reasonably conclude defendant was subjectively aware of the dangers of drinking and driving.

Fourth, defendant's driving was highly dangerous. By his own admission, he was driving at least 60 miles per hour on a city street, and was intentionally speeding toward a yellow light at the intersection, "trying to beat the yellow." Moreover, the prosecution presented evidence that the traffic light facing defendant was red when he entered the intersection.

Defendant does not dispute that all four factors are met in his case. Indeed, he acknowledges he "drank to excess" and "knew he would have to drive if he drank," knew of the dangers of drinking and driving and knew "that he should not speed, let alone speed to a yellow light in order to make it through before it turned red." But he argues that while these factors may appropriately serve as guidance to a reviewing court, they should not be mechanically applied. Defendant urges that when the record is viewed as a whole, there are key differences distinguishing his case from those affirming a finding of implied malice.

In particular, defendant notes that a number of the vehicular murder cases, including *Watson*, involved circumstances where the defendant had near-misses, minor collisions, or other warnings prior to the fatal accident, and that courts relied on those circumstances to support the conclusion that the defendant knew his conduct was dangerous. (See, e.g., *Watson, supra*, 30 Cal.3d 290 [defendant ran red light and narrowly avoided a collision]; *Autry, supra*, 37 Cal.App.4th 351 [three near misses and warnings from passengers before fatal accident]; *People v. David, supra*, 230 Cal.App.3d 1109 [defendant sped on city streets, ran red lights, traveled on wrong side of street and evaded pursuing officer]; *Olivas, supra*, 172 Cal.App.3d 984 [defendant evaded police pursuit, near collisions with two cars, struck car during chase].) Here, on the other hand, there was no evidence of any such prior mishap.

We agree with defendant that, as a general proposition, the appropriate approach is to analyze the record on a case-by-case basis, rather than apply a mechanical checklist.

10

(See *Olivas, supra*, 172 Cal.App.3d at p. 989 ["[W]e read *Watson* as deliberately declining to prescribe a formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach. If the Supreme Court had intended the factors in *Watson* to be required in all cases for a second degree murder conviction, it presumably would have said so."].) Our courts have consistently refused to hold that the absence or presence of any single factor is dispositive of this analysis. (See *ibid.*; *People v. Contreras* (1994) 26 Cal.App.4th 944, 954-955.) As a result, however, we decline to hold that a prior actual or near mishap is required to support a finding of implied malice. While a number of the cases cited herein included such warnings, defendant cites no authority suggesting that such a fact pattern is required to establish a defendant's knowledge of the risk to human life created by his or her conduct. In *Talamantes*, for example, the only evidence of a potential warning to defendant, who was drunk and driving at excessive speeds, occurred when his car "went airborne" as it crossed railroad tracks, shortly before the fatal collision. (*People v. Talamantes, supra*, 11 Cal.App.4th at p. 971.)[4] Given defendant's knowledge here of the dangers of drinking and driving and the dangers of attempting to speed through a yellow, then red, light, and his admitted awareness at the time of the accident that he was doing so, we find that a jury could reasonably infer that defendant appreciated that his conduct was dangerous to the lives of others, but chose to disregard that danger.

We similarly reject defendant's suggestion that his conviction should be reversed because there was no evidence he was aware of any other cars at the time of the accident, "not from a conscious disregard for other cars on the road, but because he was driving at a trafficless time of day." As an initial matter, the evidence showed that the site of the collision was not deserted, as defendant claims, but that there were at least two other cars near the intersection at the time—Fluker's and Bonifassi's. Moreover, the question is not

---

[4] The *Talamantes* court did not expressly rely on this fact in affirming defendant's conviction, simply noting that the evidence of implied malice in the case was "indistinguishable" from other cases. (*Id.* at p. 973.)

whether defendant had a subjective awareness of the presence of other motorists, but whether "defendant acted with a '"conscious disregard for human life"'" [citations]." (*People v. Knoller* (2007) 41 Cal.4th 139, 157.)[5]  Defendant's citation to *In re Hansen* (2014) 227 Cal.App.4th 906, a non-driving case, is inapposite.  In *Hansen*, the court rejected a finding of implied malice where the defendant shot at an apartment building, killing an occupant.  Hansen testified that, before the shooting, he "went to the apartment twice, knocked on doors and windows, and did not get any response," and therefore "he did not believe there was any chance anyone was inside the apartment at the time he shot at it."  (*Id*. at p. 924.)  Here, there is no such evidence to refute the conclusion that defendant subjectively appreciated that his highly dangerous driving created a great risk of harm or death to others.

In sum, we find there is sufficient evidence to support the conclusion that defendant knew, before he entered his vehicle and while he was driving, that his conduct was dangerous to life and consciously disregarded that risk.  As the *Watson* court observed, "'[o]ne who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.'" (*Watson, supra,* 30 Cal.3d at pp. 300-301, quoting *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 897.)  Defendant's prior drunk driving offense, his blood alcohol level and decision to drive while intoxicated, and his highly dangerous acts of speeding and attempting to "beat" a yellow light are substantial evidence to support the jury's conclusion that the subjective standard for implied malice was satisfied.[6]

---

[5] Indeed, many of the drunk driving cases involve collisions occurring in the middle of the night.  Defendant cites no authority suggesting that such a circumstance could undercut a finding of implied malice.

[6] Further, while defendant argues the fact that he did not conceal his drinking or speeding during the investigation is evidence that he lacked the requisite malice, there was evidence that he minimized his drinking during his second interview at the hospital.

**DISPOSITION**

Affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:



WILLHITE, J.



MANELLA, J.