Filed 12/26/23  P. v. Cripe CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ERIC RANDALL CRIPE,<br><br>Defendant and Appellant. | D080593<br><br><br>(Super. Ct. No. SCN426118) |


APPEAL from a judgment of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Affirmed.

Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

MEMORANDUM OPINION[1]

Eric Randall Cripe appeals from a judgment of conviction for, among other charges, a *Watson*[2] driving under the influence (DUI) murder. He contends the trial court prejudicially erred in an evidentiary ruling and committed sentencing error. We reject both contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Evidence of the Watson DUI Murder*

At 3:27 p.m. on August 22, 2021, Cripe drove his truck on State Route 79, a two-lane highway, in Temecula. Two motorists traveling behind Cripe saw him repeatedly "veer[ing]" and "swerving in and out of his lane," over the double yellow lines and into the opposing lane. According to the motorists, Cripe drove like that for nearly eight miles before he "[l]ost control" of his truck. At that point, he drove into the right dirt shoulder, overcorrected with "a hard left," and shot across the double-yellow lines into the opposing lane. This time he drove into the path of five motorcyclists, killing 34-year-old Matthew Mylerberg. Cripe's impaired driving and the fatal collision were recorded by a motorist's dashboard camera.

Earlier that day, Mylerberg had rode his motorcycle up to Idyllwild with four friends. It had been "a beautiful day" and Mylerberg persuaded his friends to take the longer scenic road on Route 79 home, telling them: "Let's go the nice, easier way back home. I want to enjoy it." After having lunch, the group got back on Route 79 and had been riding for about 15 minutes

---

[1]     We resolve this case by memorandum opinion pursuant to California Standards of Judicial Administration, section 8.1.

[2]     *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).

when Cripe drove his truck into their path. Mylerberg was struck and thrown off his motorcycle to the side of the road. He died at the scene despite attempts of life-saving measures by his friends and paramedics who responded minutes later.

Cripe stayed in the driver's seat of his truck, "just staring straight ahead" and "nonemotional . . . for somebody who just got in a crash" when CHP Officer James Pillman arrived at the scene. It was approximately 4:08 p.m. Officer Pillman immediately smelled an odor of an alcoholic beverage coming from Cripe's truck and his breath. When he asked Cripe "if he was okay," Cripe responded, "I know I just killed a man." His speech was "very slow and slurred."

Cripe told Officer Pillman he had drunk "one large gulp of vodka at 8:00 a.m. that morning." But when asked, he did not explain what one large gulp of vodka meant. Cripe declined to step out of his truck to perform field sobriety tests; he said he wanted "the Breathalyzer." Cripe then blew into a PAS (preliminary alcohol screening) device, which estimated Cripe's blood alcohol content (BAC) to be 0.206 percent at 4:18 p.m. and 0.211 percent at 4:20 p.m.[3] At this point, Officer Pillman placed Cripe under arrest. As he stepped out of his truck, Cripe "was swaying a little bit." Officer Pillman had to grab his arm and help him to the patrol car; had he not, Cripe would have

---

[3] Cripe stipulated to the PAS results and that "Officer Pillman conducted a PAS test with [Cripe] using a device that was properly calibrated, accurate, and in full working order. The testing, as well as the device itself, were in compliance with all applicable California laws and regulations."

fallen. At the Ramona CHP Station, Cripe took a chemical breath test. His BAC was 0.17 percent at 6:07 p.m. and 0.17 percent at 6:09 p.m.[4]

A criminalist testified that a man with Cripe's weight and breath test results would have a BAC between a 0.18 and 0.24 percent at the time of driving (3:27 p.m.) if he had reached peak alcohol concentration. This would be the equivalent of six to nine standard drinks circulating in the man's system.[5] If peak alcohol concentration had not been reached, the man would have a BAC between 0.15 to 0.22 percent, that is the equivalent of five to eight standard drinks in the man's system. For both scenarios, the criminalist believed the result would "more likely [be] toward the middle of the range[s] than the extremes of [the] range[s]."

Cripe's cell phone was recovered from his truck at the scene of the fatal collision. On it was a 1:29 p.m. text message sent to a group of recipients that said: "Fucked up baby. See you soon."

Cripe had been arrested in Nevada for DUI in 2000 and was convicted of DUI in Los Angeles in 2007. Cripe had completed an approximately 8-month California-licensed DUI program in February 2010; the program educated participants on "the dangers" of driving under the influence. He had also completed an approximately 4-month Youthful Drug and Alcohol Deterrence Program in August 2009. This program consisted of a coroner's morgue class, a trauma hospital visit, and a drug and alcohol awareness class

---

[4]    Cripe also stipulated to the results of the chemical breath test, and that they were obtained with a breath test machine "that was properly calibrated, accurate, and in full working order" and the testing and machine "were in compliance with all applicable California laws and regulations."

[5]    Here, "standard" is a 12-ounce beer, 5-ounce wine, or 1.5 ounce of 80 proof vodka.

4

to address the dangers of driving while under the influence. In early 2021, Cripe declined to drive for his former employer on two occasions, telling his employer he could not drive because he still had alcohol in his system.

The jury found Cripe guilty of second degree murder (Pen. Code, § 187, subd. (a); count 1); gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a); count 2); driving under the influence of alcohol causing injury (Veh. Code, § 23153, subd. (a); count 3); and driving with a measurable blood alcohol of 0.08 percent or more causing injury (Veh. Code, § 23153, subd. (b); count 4). The jury also found true that Cripe personally inflicted great bodily injury upon Mylerberg in the commission of counts 2, 3 and 4 (Pen. Code, §§ 1192.7, subd. (c)(8), and 12022.7, subd. (a) [counts 3 and 4 only]); and as to counts 3 and 4, he had a blood alcohol concentration of 0.15 percent or more (Veh. Code, § 23578).

## II.

### *Evidence of the Earlier Hit-and-Run Collision*

Less than six hours before he killed Mylerberg, at approximately 10:00 a.m., Cripe crashed his pickup truck into another motorist and left the scene. Dalton Maxfeldt was driving his vehicle on East Valley Parkway in Escondido. As Maxfeldt slowed down for a red light at the intersection of North Midway Drive, Cripe made a right-hand turn from North Midway Drive onto East Valley Parkway. Cripe then drove over the raised center median, into opposing traffic and crashed head-on into Maxfeldt. The impact "totaled" Maxfeldt's vehicle. Cripe got out of his truck, seemingly "unbalanced" and "out of it." He went over to his tailgate and "was kind of holding himself up." Maxfeldt tried talking to Cripe but Cripe "wasn't making a lot of sense." As Maxfeldt was on the phone with 911, Cripe took off in his truck without exchanging information with Maxfeldt. Cripe,

5

however, left his front license plate, which had fallen off, at the scene. The hit-and-run collision had also been recorded by a surveillance camera of a nearby business.

Cripe was charged in this case with misdemeanor hit-and-run driving (Veh. Code, § 20002, subd. (a); count 5). Before trial, he moved to sever this count from the counts arising from the fatal collision (Pen. Code, § 954), asserting the danger of prejudice greatly outweighed any interest in the efficiency of a joint trial. He further argued evidence of the hit-and-run charge was barred by Evidence Code[6] sections 1101, subdivision (b), and 352. His theory of prejudice under section 352 was that the jury would impermissibly draw from evidence he was intoxicated at the time of the fatal collision to conclude he was also intoxicated *at the time of the hit-and-run collision*. At the hearing on the severance motion, defense counsel reiterated the defense's "primary concern with allowing this jury to hear evidence of the hit-and-run in the morning . . . is that we're inviting this jury to speculate about [Cripe] being under the influence at the time" of the hit-and-run collision, which is not an element of the charge. In other words, "evidence [would be] used from the second incident *to prove the first*, rather than the first to prove the second." (Italics added.)

The trial court denied the motion to sever.[7] It found the evidence of the hit-and-run and the fatal collision was cross-admissible "[b]oth ways." The hit-and-run collision was admissible to show Cripe's implied malice on the second degree murder charge (count 1) and gross negligence on the

---

[6] Further undesignated statutory references are to the Evidence Code.

[7] Cripe does not claim any error in the trial court's denial of the severance motion.

6

vehicular manslaughter charge (count 2). That is, Cripe's admission at the fatal collision that he consumed alcohol at 8:00 a.m., his driving pattern and physical presentation ("holding himself up by the pickup truck") in the hit-and-run tended to show Cripe knew *that day* that driving under the influence was dangerous to human life. The court found the fatal collision was cross-admissible to identify Cripe as the perpetrator of the hit-and-run (count 5), noting that the cell phone seized from Cripe at the scene of the fatal collision contained photographs of Maxfeldt's totaled vehicle and cell phone data generally placed Cripe in the locations of both collisions.

After the trial court denied the severance motion, Cripe proposed he would plead guilty to the hit-and-run charge so as to make the evidence no longer relevant at trial. The court responded that a plea to count 5 would not eliminate the relevance and admissibility of the hit-and-run collision to show implied malice and gross negligence under section 1101, subdivision (b). The court then conducted a section 352 analysis and found the "high probative value" of the evidence was not substantially outweighed by the danger of undue prejudice, considering in particular that the hit-and-run was captured on video, it occurred the same day "[v]ery close in time," and was "certainly not as offensive as the charged conduct." The court clarified a guilty plea to count 5 would not change its evidentiary ruling. Cripe then entered a guilty plea to count 5.

On the third day of evidence, the trial court ruled it would not be instructing the jury that evidence of the hit-and-run collision would be restricted to the limited purposes of showing implied malice and gross negligence. The court found substantial evidence had been presented from which the jury could conclude "this [w]as one continuous event of [Cripe] being under the influence that day, as opposed to two separate events." In

7

particular, the court noted Cripe's admission he started drinking at 8:00 a.m. the day of both collisions, Maxfeldt's testimony that suggested Cripe was intoxicated at the time of the hit-and-run collision, and the criminalist's testimony on the BAC levels. She had opined a man with Cripe's weight and breath results of 0.17/0.17 at 6:07/6:09 p.m., assuming there was no additional drinking after 10:00 a.m. and full absorption, would have a BAC between a 0.23 and 0.38 percent at 10:00 a.m., the equivalent of 8 to 14 standard drinks. If the alcohol had not fully absorbed, the BAC range decreases to 0.21 to 0.35 percent, the equivalent of 7 to 13 standard drinks. As before, the criminalist believed the result was "more likely" in the middle than the extremes. There was no objection by the defense to this testimony.

## DISCUSSION

### I.

*Any Error in Admitting Evidence of the Hit & Run Collision Was Harmless*

Cripe contends that "in light of [his] plea" to count 5, the trial court prejudicially erred by admitting evidence of the hit-and-run collision. He argues evidence of the hit-and-run collision was not admissible under section 1101, subdivision (b), because it "did not tend to 'logically, naturally and by reasonable inference' prove implied malice or gross negligence," and even if there was some relevance to those issues, the evidence should have been excluded as cumulative to the prosecution's other evidence on Cripe's mental state under section 352. Although doubtful of the claim, we will assume without deciding the court's admission of the hit-and-run collision evidence was erroneous, but conclude any such error was harmless.

We do not disturb a trial court's erroneous exercise of discretion unless it "resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) A trial court's error under state law in the admission or

8

exclusion of evidence is reviewed for prejudice under *Watson* harmless error test. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) Under that test, the trial court's evidentiary ruling may be reversed only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*People v. Watson*, at p. 836.)

A second degree DUI murder under *Watson, supra,* 30 Cal.3d 290, requires proof of implied malice—that "the defendant deliberately performed an act, the natural consequences of which are dangerous to life, knowing that the conduct endangers the life of another, but acting with conscious disregard for that risk of life. (*Id.* at pp. 296, 300.) Implied malice requires that the accused actually appreciated the risk involved. (*Id.* at pp. 296–297.)" (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.) California courts "have relied on some or all of the following factors in upholding [*Watson* DUI murder] convictions: (1) blood-alcohol level above the 0.08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*Autry*, at p. 358 [cataloging cases which have upheld "drunk driving murder convictions"].) All four factors were firmly established in this case, even without the hit-and-run evidence.

Cripe stipulated his BAC was 0.206 and 0.211 percent when he blew into the PAS device and that his BAC was 0.17 and 0.17 percent when he later took the chemical breath test results. He also did not challenge the criminalist's testimony that his BAC at the time of driving in the fatal collision was between 0.18 and 0.24 percent at peak absorption, or between 0.15 and 0.22 percent if not fully absorbed. He admitted he started drinking vodka at 8:00 a.m. and said in a 1:29 p.m. text that day he was "Fucked up."

He knew the hazards of driving while intoxicated because, at minimum, he had previously completed a total of 12 months of DUI-related programs that educated him on the dangers of driving under the influence. Further, he acknowledged to his former employer in early 2021 that he should not drive when he had alcohol in his system. Despite that knowledge, and with a dangerously high BAC, he drove impaired on a two-lane highway. Two motorists testified he repeatedly swerved in and out of his lane and crossed over the double yellow lines into opposing traffic for some distance before he lost control and killed Mylerberg. Further still, his highly dangerous driving was recorded by a dashboard camera for the jury to see.

On the record before us, we have little difficulty concluding there is no reasonable probability that Cripe would have obtained a more favorable result absent the hit-and-run evidence. Cripe's attempts to argue otherwise are not persuasive. He asserts evidence of the hit-and-run collision "allowed the jury to speculate that [Cripe] was highly intoxicated at the time of the morning accident and continued to drive in that intoxicated state all day until the fatal accident in the afternoon." But the jury could have concluded Cripe's prior state of intoxication simply from his admission that he began drinking at 8:00 a.m. and his text message at 1:29 p.m. that he was "Fucked up." We also disagree with Cripe's contention that the prosecution's "other evidence" of his knowledge and intent was "far less compelling." We do not need to repeat our discussion regarding the strength of the evidence of Cripe's knowledge of the hazards of driving under the influence. Finally, Cripe argues his 2021 acknowledgments to his employer that he should not drive after drinking actually showed he "affirmatively acted to <u>avoid</u> conduct which would endanger others." The argument is without merit. If anything, it proves too much. If he knew how to affirmatively avoid endangering

10

others, then his actions on the day in question say, " 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987–988.) That is implied malice. (*Ibid.*)

In sum, Cripe fails to establish he was prejudiced by any error.[8]

## II.

### *No Sentencing Error*

In a separate proceeding, the jury found true aggravating sentencing factors, including that Cripe committed an offense that involved great violence or other acts disclosing a high degree of viciousness and/or callousness (Cal. Rules of Court, rule 4.421(a)(1)) and engaged in violent conduct that indicates a serious danger to society (Cal. Rules of Court, rule 4.421(b)(1)). The jury found the circumstance that the victim was particularly vulnerable to be not true (Cal. Rules of Court, rule 4.421 (a)(3)). The trial court sentenced Cripe to 15 years to life on count 1 and a concurrent 6-month sentence on count 5. The court sentenced Cripe to the upper term of 10 years on count 2, but stayed the punishment pursuant to Penal Code section 654; and dismissed counts 3 and 4 and the associated enhancements because they were lesser included offenses of count 2.

Cripe contends the trial court improperly imposed the upper term on count 2 based in part on the dual use of facts which constitute an element of the crime of gross vehicular manslaughter while intoxicated, i.e., driving while intoxicated and knowing such conduct is dangerous to human life. (See *People v. Scott* (1994) 9 Cal.4th 331, 350 [a sentencing court may not "use a fact constituting an element of the offense either to aggravate or to enhance a

---

8    We do not address any asserted prejudice as to the other counts because Cripe has not.

sentence"]; Cal. Rules of Court, rule 4.420(h) ["A fact that is an element of the crime on which punishment is being imposed may not be used to impose a particular term."].)

We disagree. The trial court pointed to these facts not as facts in aggravation but as a reason for rejecting Cripe's contention that his alcoholism was a mitigating factor. The court explained: "[A]lthough the [c]ourt recognizes that alcoholism is a disease that can be difficult to control, the evidence shows that the defendant was fully aware of the dangerousness of driving while intoxicated. He made a conscious decision to drive and then continued driving even after the first collision. [¶] So irrespective of the alcoholism his culpability is not reduced."[9] We find no sentencing error here.

DISPOSITION

The judgment is affirmed.


DO, J.


WE CONCUR:



DATO, Acting P. J.



CASTILLO, J.

---

[9] In his opening brief on appeal, Cripe also claimed the upper term sentence on count 2 was not authorized because he lacked notice of the aggravating factors. Cripe withdrew this claim after the Attorney General correctly pointed out that the operative information did in fact plead the aggravating factors which the jury determined to be true.