Filed 1/26/21  P. v. Lara CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ADALBERTO CARILLO LARA,<br><br>  Defendant and Appellant. | F078337<br><br>(Super. Ct. No. 17CMS-0637)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County. Donna L. Tarter, Judge.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Adalberto Carillo Lara was under the influence of alcohol when he ran a stop sign at a speed of approximately 70 miles per hour and hit another vehicle, killing all three occupants.

A jury convicted defendant on three counts of second degree murder (Pen. Code, § 187, subd. (a);[1] counts 1-3), three counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); counts 4-6), driving under the influence of alcohol and causing bodily injury (Veh. Code, § 23153, subd. (a); count 7), and driving with a blood-alcohol content of 0.08 percent or higher and causing bodily injury (Veh. Code, § 23153, subd. (b); count 8). As to counts 7 and 8 the jury found defendant had proximately caused bodily injury or death (Veh. Code, § 23558), and that his blood-alcohol concentration was 0.15 percent or more (Veh. Code, § 23578), and defendant admitted he had suffered a prior conviction for driving under the influence within the previous 10 years (Veh. Code, §§ 23152, subd. (b), 23560). He was sentenced to an aggregate term of 45 years to life and was ordered to pay a $10,000 restitution fine (§ 1202.4, subd. (b)), as well as other fines, fees, and assessments.

On appeal, he contends there was insufficient evidence of malice to support his convictions for second degree murder, and that the fines, fees, and assessments imposed by the trial court violate his right to due process because he is unable to pay.

We find the evidence sufficient to support the convictions. We reject defendant's challenge to the fines, fees, and assessments on various grounds. However, we remand for the trial court to correct the sentencing minute order and the abstract of judgment to accurately reflect the court's oral pronouncement of judgment. In all other respects, we affirm.

---

[1] Subsequent statutory references are to the Penal Code, unless otherwise indicated.

# FACTS

Defendant sold washing machines and dryers at a "flea market." On March 27, 2017, Marcos C.,[2] who sold fruits and vegetables in a nearby stall, saw defendant drink between one and three Budweiser or Miller beers sometime between 8:30 a.m. and 3:30 p.m. Around 3:30 p.m., defendant gave Marcos a ride home to Hanford. Defendant told Marcos he was going to a friend's house to build a fence.

Around 4:00 p.m., defendant arrived at the home of his friend Jose M. in Hanford. He assisted Jose with building a fence and remained there for approximately three and a half hours. During that time, defendant and Jose each drank two or three 12-ounce Budweiser beers.[3] Defendant left in his truck at approximately 7:30 p.m. or 8:00 p.m. to drive home to Tulare.

At about 8:30 p.m., defendant was traveling eastbound on Idaho Avenue in his Chevrolet pickup truck when he collided with a silver Chevrolet Equinox at the intersection of Idaho Avenue and Highway 43. Several other drivers saw the collision or its aftermath, and testified to what they saw.

Anthony S. was driving northbound on Highway 43 with a female passenger when he saw defendant's truck, which was heading east, run the stop sign at the intersection of Idaho Avenue and Highway 43 at a speed of approximately 75 to 80 miles per hour.[4]

---

[2]    Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

[3]    At trial, California Highway Patrol (CHP) Officer Lawson testified that, in July 2017, Julio S. came to the Hanford CHP office and indicated he wished to share information regarding the collision. Julio told Lawson that he saw defendant drink two or three Budweiser beers at the flea market around noon on the day of the collision. Julio reported that he later saw defendant working on a fence with Jose, and saw defendant drink two more beers and a glass of clear liquid around 4:30 p.m. At trial, Julio did not recall these prior statements and denied seeing defendant that day.

[4]    As explained below, there were stop signs on Idaho Avenue in both directions, and no stop on Highway 43.

3.

Defendant's truck hit the middle of an SUV (sport utility vehicle) that was traveling southbound on Highway 43 and knocked it into a field. Both cars flipped and debris went everywhere. Defendant's truck landed on its wheels, while the SUV landed upside down. Anthony pulled over and he and his passenger checked on both vehicles. Defendant was unresponsive in his truck and appeared to be passed out. His vehicle smelled of alcohol. He had a grimace on his face as if from pain. In the SUV, Anthony saw a man, woman, and child. The air bags inside the vehicle had deployed. He heard someone groaning but could not tell who it was. He tried to open the doors but was unable to do so. He spoke with another witness who had arrived after him and had called 911. At that point, Anthony "freaked out and left." The following month, he was contacted by CHP officers.

Kevin S. was driving northbound on Highway 43 when he saw a vehicle driving eastbound on Idaho Avenue at a speed in excess of 65 miles per hour. He grew concerned the vehicle would go through the stop sign at the intersection with Highway 43. There was a car in front of Kevin, and Kevin crossed over the center divider into the southbound lane to determine whether there were any cars further ahead on Highway 43. As he did so, the car that had been traveling east on Idaho Avenue failed to stop at the stop sign and "the impact happened." The car in front of Kevin pulled over and the occupants attended to the vehicles involved in the collision. Kevin pulled over and remained in his car. From there, he saw one person in the driver's seat of the truck. At some point before emergency personnel arrived, the individuals who had been traveling in the vehicle in front of Kevin left. After emergency personnel arrived, Kevin saw the driver of the truck standing next to the truck, staring at the other vehicle. Kevin gave a CHP officer the vehicle license plate information for the vehicle that left the scene.

Brian B. was pulled over facing northbound on Highway 43, about three quarters of a mile from the intersection with Idaho Avenue, when he saw a vehicle heading

4.

eastbound on Idaho Avenue at approximately 70 to 80 miles per hour and thought, "[T]hat car is hauling butt." He then saw headlights "all over the place" and knew there had been an accident. He pulled up to the scene and saw someone already on the phone. He saw defendant inside the truck and thought he was deceased because there was blood coming out of his ears. Brian could not see inside the other vehicle due to the airbags. He screamed, "Hello, how many people are in here," but received no response. He then saw defendant crawl out of the truck through the windshield or side window.

Officer Lawson arrived on scene at approximately 8:40 p.m. Defendant was kneeling by the driver side door of his truck, which had extensive front end damage. Lawson smelled alcohol on him immediately. Defendant's speech was slow and slurred, and his eyes were red and watery. Lawson asked defendant if he had consumed any alcoholic beverages and defendant said no.

The Equinox was overturned on its roof and had rollover damage to the entire vehicle, with a majority of the damage to the right side. The driver of the vehicle, Kristen W., appeared to be alive. She was groaning as fire personnel attempted to extricate her from the car. The front seat passenger, Alfonso W., and the rear seat passenger, Kyan W., appeared to be deceased. Alfonso and Kyan were pronounced deceased shortly thereafter and Kristen was transported by helicopter to the hospital but did not survive. All three died of blunt force trauma. Kyan, who was 13 years old, had "a very large laceration on the left forehead . . . [and] multiple skull fractures," as well as blood in his chest cavity that likely resulted from a torn aorta, and a fractured right femur. Alfonso, who was 55 years old, suffered a basilar skull fracture and also had blood in his chest cavity. Kristen, who was 44, had blood in her chest cavity, swelling around her eye indicative of a fractured orbital wall, and multiple contusions throughout her body.

At the scene of the collision, Lawson observed that defendant was unsteady on his feet, walked in a side to side manner, and stumbled twice as he walked to an ambulance. Lawson asked again whether defendant had consumed alcohol and defendant said he had

5.

one beer. When Lawson asked again, defendant said he had two beers at noon. Defendant shook his head "no" when asked if he knew how the accident happened.

Lawson administered field sobriety tests to defendant. On the horizontal gaze nystagmus test, defendant's eyes immediately jerked involuntarily, which would typically indicate a blood-alcohol concentration above 0.08 percent. Lawson administered a preliminary alcohol screening test, which detected the presence of alcohol. Defendant refused to cooperate in the administration of a second test. Lawson formed the opinion that defendant "had been operating a vehicle while being under the influence of an alcoholic beverage" with a blood-alcohol concentration above 0.08 percent.

Defendant was transported to the hospital by ambulance. A blood sample was taken from defendant at the hospital at 10:49 p.m. on March 27, 2017.

Jessica Winn, a senior criminalist with the California Department of Justice Bureau of Forensic Services, analyzed the sample of defendant's blood that was drawn at 10:49 p.m., and determined it showed a blood-alcohol content of 0.17 percent. She opined that a person with a blood-alcohol concentration between 0.01 and 0.06 percent will begin to experience mental impairment, including decreased attention to tasks such as driving, decreased judgment, decreased inhibitions, and altered perception of distance, speed, and time. Winn explained that a person with a blood-alcohol concentration above 0.06 percent would also begin to experience physical impairment, including altered balance, coordination, vision, hearing, speech, and reaction time. Winn further opined that a person with a blood-alcohol concentration of 0.17 percent would experience all of these mental impairments, and some, if not all, of these physical impairments. In Winn's opinion, a person with a blood-alcohol content of 0.17 percent is "too impaired to safely operate a motor vehicle." Winn opined that a person with a 0.17 percent blood-alcohol content at 10:49 p.m. would have had a 0.21 or 0.22 percent blood-alcohol content at 8:30 p.m. Such a person may have impaired judgment and increased confidence and, based thereon, may not be able to understand whether it is safe for him or her to drive.

6.

CHP Officer Machado investigated the collision and testified at trial regarding his findings. He noted Highway 43 had two lanes of travel, one northbound and one southbound, with no traffic controls. Idaho Avenue also had two lanes of travel, one eastbound and one westbound, with traffic in both directions controlled by stop signs. Stop signs were actually present and unobstructed in both directions on Idaho Avenue at the intersection. Additionally, there was a yellow "stop ahead" sign in the eastbound lane of Idaho Avenue, approximately 500 feet before the intersection, and the words "stop" and "ahead" were written in the eastbound lane. The intersection had a faded limit line at the intersection and only part of the word "stop" remained on the pavement. Machado opined that the Equinox was traveling 54 miles per hour when it was struck on its right side by the truck, which was traveling approximately 70 miles per hour, and that the driver of the truck caused the collision.

Outside the presence of the jury, defendant admitted the prior conviction allegation (Veh. Code, § 23560) to counts 7 and 8, in that he was convicted on August 31, 2016, of driving with a blood-alcohol content greater than 0.08 percent (*id*., § 23152, subd. (b)) in Kings County Superior Court case No. 16CM-2266. Before the jury, the People introduced evidence that defendant pled no contest to that offense on that date. The People also presented evidence that defendant initialed the following advisement in his change of plea form, and that the advisement was read to him in Spanish by a qualified interpreter:

> "I understand that being under the influence of alcohol or drugs, or both, impairs my ability to safely operate a motor vehicle, and it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If I continue to drive while under the influence of alcohol or drugs, or both, and as a result of my driving, someone is killed, I can be charged with murder."

Furthermore, the People presented evidence that the court reiterated this potential consequence during defendant's plea colloquy, and that defendant indicated he understood.

The People also presented evidence that defendant was required, as a condition of his probation for his prior offense, to complete a nine-month driving under the influence of alcohol (DUI) program, to attend four Alcoholics Anonymous (AA) meetings per week, and to present in court weekly to demonstrate compliance with the AA meeting requirement. Defendant signed a contract with the DUI program and began attending on September 12, 2016.[5] One of the objectives of the program was to educate participants about the effects of alcohol and other drugs and their impact on the individual, family, and community, including teaching people not to drink and drive.

The DUI program required that defendant complete seven educational classes, 22 group sessions, and 19 individual counseling sessions. Defendant completed all seven educational classes, which discussed "what drinking and driving could cause," including accidents and death. Defendant completed 11 of the 22 group sessions, and eight of the 19 individual counseling sessions. On February 15, 2017, defendant was declared out of compliance because he exceeded the number of sessions he was allowed to miss. The parties stipulated that defendant appeared in court, on the following dates, to show proof of his attendance in four AA meetings per week: September 7, 14, 21, and 29, 2016; October 12 and 19, 2016; November 11, 2016; December 14, 2016; January 25, 2017; and March 23, 2017.

The parties stipulated that, on March 27, 2017, defendant weighed 165 pounds, was five feet nine inches tall, and was 42 years old.

Defendant did not present any evidence or testify at trial.

---

[5]  The contract defendant signed was in Spanish. An English language version of the contract was also entered into evidence.

DISCUSSION

## I. Evidence of Implied Malice

Defendant contends the evidence of implied malice was insufficient to support a conviction for second degree murder. We disagree.

"The test for evaluating a sufficiency of evidence claim is deferential: 'whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We must 'view the evidence in the light most favorable to the People' and 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*People v. Flores* (2020) 9 Cal.5th 371, 411.)

To support a finding of implied malice, the evidence must establish that the defendant deliberately committed an act, the natural consequences of which were dangerous to life, with knowledge of its danger to life and a conscious disregard of that danger. (*People v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson*).) "Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987-988 (*Olivas*).) A finding of implied malice requires that the defendant actually appreciated the risk involved. (*Watson*, *supra*, at pp. 296-297.)

*Watson* is the leading case on vehicular murder involving implied malice. (*Watson*, *supra*, 30 Cal.3d 290.) There, the defendant drove to a bar and consumed "large quantities of beer." After leaving the bar, he drove through a red light and narrowly avoided a collision with another car. He then drove away at high speed, accelerating to 84 miles per hour before suddenly braking and skidding into an intersection where he collided with another car, killing two people. The defendant's blood-alcohol level one-half hour after the collision was 0.23 percent. An information

charged him with two counts of second degree murder, but the trial court dismissed the murder counts. (*Id.* at pp. 293-294.)

On the People's appeal, our Supreme Court reversed the dismissal, holding there was sufficient evidence to uphold the second degree murder counts in the information. (*Watson*, *supra*, 30 Cal.3d at p. 301.) The court cited to the following evidence as sufficient to support a finding that the defendant acted with conscious disregard for life: the defendant's blood-alcohol level was sufficient to find him legally intoxicated; he drove to the establishment where he was drinking knowing that he had to drive later; he was presumed to be aware of the hazards of driving while intoxicated; he drove at high speeds on city streets, creating a great risk of harm or death; and he was aware of the risk, as shown by the near collision and his belated attempt to brake before the fatal collision. (*Id.* at pp. 300-301.)

Since *Watson*, appellate courts have upheld numerous murder convictions in cases where defendants have caused death while driving under the influence of alcohol. (E.g., *People v. Wolfe* (2018) 20 Cal.App.5th 673, 679, 680, 683 (*Wolfe*) [driver had blood-alcohol level of 0.34 percent, was aware of dangers of drinking and driving and had previously used a taxi service, drank with intention of driving home, and continued driving her damaged vehicle after hitting a pedestrian]; *People v. Autry* (1995) 37 Cal.App.4th 351, 358-359 (*Autry*) [driver had a blood-alcohol level of 0.22 percent, was warned of the dangers of drinking and driving, drank and drove throughout the day, had three near misses, and continued driving over protests of his passengers]; *People v. Murray* (1990) 225 Cal.App.3d 734, 746-747 [driving wrong way on a freeway with a blood-alcohol level between 0.18 and 0.23 percent]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 533 [crossing into oncoming traffic on two-lane highway with a blood-alcohol level of 0.27 percent]; *Olivas*, *supra*, 172 Cal.App.3d at p. 989 [extremely dangerous driving while under influence of PCP and "negligible" amount of alcohol].) These cases have generally relied on some or all the factors that were present in *Watson*:

"(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*Autry*, *supra*, at p. 358.)

Considering these factors here, there was substantial evidence to support a finding of implied malice. There is no question defendant was intoxicated beyond the legal limit. His blood-alcohol concentration approximately two hours after the collision was 0.17 percent, and an expert opined it may have been as high as 0.22 percent at the time of the collision. Additionally, defendant had a predrinking intent to drive, inasmuch as he consumed several alcoholic beverages at the flea market before driving himself to Jose's home and drinking more.[6]

Defendant also drove above the speed limit[7] and through a well-marked stop sign without braking, conduct that is highly dangerous. A reasonable juror could conclude defendant was subjectively aware of the risk of this conduct. (*People v. Moore* (2010) 187 Cal.App.4th 937, 941 ["Whether [the defendant] was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [the defendant] was aware of the risk."].)

Lastly, and significantly, defendant had knowledge of the hazards of driving while intoxicated, including the risk of killing someone and being charged with murder. (*People v. David* (1991) 230 Cal.App.3d 1109, 1115 ["Prior convictions and exposure to

---

**6** Defendant argues there was no evidence he had a preexisting intent to drink at any of the locations he went to on the date of the incident. However the relevant question is whether defendant had a predrinking intent to *drive*, not a preexisting intent to *drink*. (*Autry*, *supra*, 37 Cal.App.4th at p. 358.) Defendant drank alcohol, then drove himself to Jose's house, where he drank more before attempting to drive home. The inescapable inference is that he drank alcohol, despite knowing he would drive later. (*Watson*, *supra*, 30 Cal.3d at pp. 300-301.)

**7** Lawson testified that the speed limit on both Highway 43 and Idaho Avenue was 55 miles per hour.

mandatory educational programs are admissible to show the accused's awareness of the life threatening risks of driving under the influence."].)  A reasonable juror could conclude that the foregoing factors, taken together, evidence defendant acted with conscious disregard for the danger defendant posed to the lives of others on the roadway.

Defendant nonetheless presents several reasons he believes the evidence of his guilt is insubstantial.  He points to evidence that he once slept on a trailer on Jose's property, and asserts he may have intended to do so on the night in question, but instead chose to drive because he was too highly intoxicated to realize his driving was unsafe.  Somewhat contrarily, he contends he did not drink an excessive amount of alcohol, despite his having an extremely elevated blood-alcohol concentration.  He also claims there was no evidence the alcohol education programming he received following his prior arrest was conducted in Spanish, and that there was no evidence he had caused prior accidents or exhibited reckless driving before running the stop sign.

Certainly, the jury could have considered the above factors in determining whether defendant acted with implied malice.  However, considering the evidence in the light most favorable to the judgment, as we are required to do (*People v. Hatch* (2000) 22 Cal.4th 260, 272), we have no difficultly concluding the evidence was sufficient to support a finding of implied malice.

## II.  Fines, Fees, and Assessments

Although he did not object below, defendant contends the fines, fees, and assessments imposed by the trial court violate his right to due process under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution because he is unable to pay.  He contends the matter must be remanded for the trial court to conduct a hearing on his ability to pay, and to reset fines and fees in an amount that would not be burdensome in light of his indigency.  In support, defendant relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), and *Timbs v. Indiana* (2019) 586 U.S. ___ [139 S.Ct. 682] (*Timbs*), both of

which were decided after his sentencing hearing.  To the extent his arguments are forfeited, defendant alleges ineffective assistance of counsel.

### A.     Additional Factual Background

Because defendant did not argue in the trial court that he was unable to pay, the record regarding his financial circumstances is not developed.  However, the probation officer's report notes that defendant had six children between the ages of six and 16 years old, made approximately $900 per month as an appliance repair person, and earned supplemental income in an undisclosed amount selling used appliances.  Additionally, as defendant points out, he was represented by appointed counsel at trial.

The trial court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)); a $10,000 parole revocation fine, stayed pending successful completion of parole (§ 1202.45); a $240 court facilities assessment (Gov. Code, § 70373); and a $320 court operations assessment (§ 1465.8).  Victim restitution was reserved.

The court also orally imposed a $390 penalty fine without citing to the statutory basis for the fine or the count on which it was imposed,[8] a $390 state penalty assessment (§ 1464), a $78 state surcharge (§ 1465.7, subd. (a)), a $230[9] county penalty assessment (Gov. Code, § 76000), a $195 court construction penalty assessment (Gov. Code, § 70372), a $4 Emergency Medical Air Transport Act penalty assessment (Gov. Code, § 76000.10, subd. (c)(1)), a $39 DNA funding penalty assessment (Gov. Code, § 76104.6), a $156 DNA funding penalty assessment (Gov. Code, § 76104.7), a $100 alcohol assessment program assessment (Veh. Code, § 23649), a $50 alcohol abuse and prevention assessment (Veh. Code, § 23645), and a $10 DMV notification assessment

---

[8]     It appears the fine may have been imposed pursuant to a Vehicle Code section 23560 enhancement to either count 7 or 8, which mandates imposition of a fine of not less than $390.  However, sentence on both counts was stayed.

[9]     This amount appears to be in error.  The statutory county penalty assessment on a $390 fine is $273.  (Gov. Code, § 76000, subd. (a)(1).)

(Veh. Code, § 40508.6, subd. (b)). Neither the fine nor the assessments appear in the court's minute order or abstract of judgment.[10]

The court is required to delineate all fines, fees, and assessments imposed on each count, and the statutory basis for each, in the abstract of judgment and the sentencing minute order. (*People v. Hamed* (2013) 221 Cal.App.4th 928, 937-941; *People v. High* (2004) 119 Cal.App.4th 1192, 1200.) The failure to do so may interfere with the Department of Corrections and Rehabilitation's "statutory duty to collect and forward deductions from prisoner wages to the appropriate agency." (*High*, at p. 1200.) Furthermore, to the extent any punitive fines or assessments were imposed in relation to a count that was stayed, those fines and assessments must also be stayed. (*People v. Sharret* (2011) 191 Cal.App.4th 859, 869-870.) Here, the court's failure to reduce the fine and assessments to writing leaves uncertain the statutory basis for the $390 fine and whether that fine and the related assessments are, or must be, stayed. Additionally, the omission has resulted in a numerical discrepancy between the oral pronouncement of judgment and the sentencing minute order with regard to the sum total financial burden imposed on defendant. We will remand for the court to correct the sentencing minute order and the abstract of judgment to accurately reflect the fines, fees, and assessments imposed by the court.

This error does not materially affect our analysis of defendant's constitutional challenge to the fines, fees, and assessments.

---

[10] The court's minute order lists a fine of "$0" on each count, a "Criminal Violation Distribution" of $70 on each of counts 1 through 6, a "1st DUI Distribution" of $1,695 on count 7, and a "1st DUI Distribution" of $70 on count 8. The sum total of restitution, "Criminal Violation Distribution[s]," and "1st DUI Distribution[s]" listed in the minute order is $12,185, while the sum total of fines, fees, and assessments orally imposed by the court is $12,202. There is no discernable explanation for the discrepancy.

14.

**B.** *Dueñas*

*Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or fees. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164; see *id.* at p. 1167.) This court has rejected that contention. (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069 (*Aviles*) [*Dueñas* "incorrectly relied upon a due process analysis to examine . . . constitutional objections to the [trial] court's imposition of . . . fines, fees, and assessments . . . ."]; accord, *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1056-1057 [due process not violated when defendants are not denied access to the courts, are not prohibited from presenting a defense, are not incarcerated due to an inability to pay prior fees, fines or assessments, do not face ongoing unintended punitive consequences, and do not suffer a violation of a fundamental liberty interest].)

Other courts have declined to extend the holding of *Dueñas* beyond the unique facts of that case, which involved an indigent, homeless, mother of two who subsisted on public aid while suffering from cerebral palsy (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160-1161), and who accumulated repeated criminal conviction assessments and fines in a series of "cascading consequences" stemming from "criminal proceedings driven by, and contributing to, [the defendant's] poverty" (*id.* at pp. 1163-1164). (See *People v. Caceres* (2019) 39 Cal.App.5th 917, 928-929 [declining to apply *Dueñas*'s "broad holding" beyond its unique facts]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 138 [distinguishing *Dueñas* on its facts].)

Here, we need not consider defendant's *Dueñas*-based challenge because defendant has forfeited the issue. The court ordered defendant to pay the maximum restitution fine of $10,000. (§ 1202.4, subd. (b)(1).) When the court imposes a restitution fine greater than the $300 statutory minimum, "[s]ection 1202.4 expressly contemplates an objection based on inability to pay." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153 (*Frandsen*); accord, *Aviles*, *supra*, 39 Cal.App.5th at p. 1073.)

15.

While *Dueñas* had not been decided at the time of defendant's sentencing hearing, defendant had the statutory right to object to the $10,000 restitution fine and to demonstrate his inability to pay, and such an objection "would not have been futile under governing law at the time of his sentencing hearing." (*Frandsen*, at p. 1154; accord, *Aviles*, at pp. 1073-1074; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*) ["[E]ven before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute [citation] expressly permitted such a challenge."].) Similarly, the court had a statutory duty to determine whether defendant had the ability to pay the $100 alcohol assessment program assessment (Veh. Code, § 23649, subd. (b)), and the $50 alcohol abuse and prevention assessment (*id.*, § 23645, subd. (c)), and we presume that it did so. Defendant's failure to object in the trial court forfeits his challenge to these fines and assessments.

The remaining fines, fees, and assessments are mandatory, and defendant lacked the statutory right to object based on ability to pay. Nonetheless, he forfeited the right to object to these assessments as a practical matter. Having chosen not to object to the $10,000 restitution fine or the $150 in alcohol-related assessments based on inability to pay, "he surely would not complain on similar grounds" regarding less than $2,000 in additional assessments. (*Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033.) Furthermore, although the fees and assessments were mandatory, nothing in the record of the sentencing hearing indicates that defendant was foreclosed from challenging these assessments in the trial court in the first instance. (*Aviles*, *supra*, 39 Cal.App.5th at p. 1074; *Frandsen*, *supra*, 33 Cal.App.5th at p. 1154.) "[D]efendant plainly could have made a record had his ability to pay actually been an issue. Indeed, [he] was obligated to create a record showing his inability to pay the . . . restitution fine, which would have served to also address his ability to pay the assessments." (*Frandsen*, at p. 1154; accord, *Aviles*, at p. 1074.)

16.

Defendant asserts that, if we find forfeiture, his trial counsel was ineffective for failing to object to the imposition of fines and fees based on an inability to pay. Defendant bears the burden of demonstrating ineffective assistance of counsel. (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) " '[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' [Citation.] Rarely is ineffective assistance of counsel established on appeal since the record usually sheds no light on counsel's reasons for action or inaction." (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.) In determining whether counsel's performance was deficient, we consider whether " ' " 'counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) Reversal is permitted " 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

We cannot say trial counsel had no conceivable tactical purpose for not requesting an ability to pay hearing. The record reflects defendant was 44 years old at the time of sentencing and was employed and had a side business earning an undetermined amount at the time he committed the offenses. It is conceivable counsel concluded defendant would have been able to pay his fines and fees over time. (*Aviles*, *supra*, 39 Cal.App.5th at pp. 1075-1077.) The record does not affirmatively exclude a rational basis for trial counsel's choice. Defendant has failed to establish ineffective assistance of counsel.

Finally, even if defendant did not forfeit the issue, any error under *Dueñas* is necessarily harmless since defendant has the ability to make payment on the fines, fees, and assessments over the course of his long prison sentence. (*Aviles*, *supra*, 39

17.

Cal.App.5th at pp. 1075-1077.) "While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from either prison wages or monetary gifts from family and friends during his lengthy prison sentence." (*Id.* at p. 1077.) As defendant points out, it is possible he will not extinguish his debt while incarcerated. However, his prior employment history suggests he will be able to continue making payments on any remaining debt if and when he is released.

### C.    *Timbs*

The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[11] *Timbs* held that the Eighth Amendment's "excessive fines" clause was incorporated into the Fourteenth Amendment's due process clause, and therefore applies to the states. (*Timbs*, *supra*, 139 S.Ct. at pp. 686-687.) We agree with defendant's implicit argument that an Eighth Amendment analysis is appropriate to determine whether punitive fines, fees, and assessments in a particular case are excessive. (*Aviles*, *supra*, 39 Cal.App.5th at pp. 1069-1071.)

"We may review de novo whether a fine is excessive under the Eighth Amendment." (*Aviles*, *supra*, 39 Cal.App.5th at p. 1072.) "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish. [Citations.] . . . [A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." (*United States v. Bajakajian* (1998) 524 U.S. 321, 334; accord,

---

[11]    Article I, section 17 of the California Constitution similarly provides: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." Defendant does not cite article I, section 17 in his briefing.

18.

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728 (*Lockyer*); see *Timbs*, *supra*, 139 S.Ct. at pp. 688-689.)

Federal circuit courts are divided on the question of whether ability to pay is relevant to the excessive fines analysis. (E.g., *U.S. v. Viloski* (2d Cir. 2016) 814 F.3d 104, 111 [ability to pay is relevant to the proportionality inquiry]; *U.S. v. Levesque* (1st Cir. 2008) 546 F.3d 78, 83-85 [ability to pay should be considered, in addition to proportionality inquiry]; *U.S. v. Dubose* (9th Cir. 1998) 146 F.3d 1141, 1145-1146 [ability to pay has no bearing on analysis].) The United States Supreme Court has left this question open (see *Timbs*, *supra*, 139 S.Ct. at p. 688), but has noted the Eighth Amendment's historical roots in prohibitions against monetary penalties that are " 'so large as to deprive [the defendant] of his livelihood' " (*Timbs*, at p. 688). This history has been interpreted to prohibit fines that are "ruinous," or that affect the defendant's "future ability to earn a living." (*Levesque*, at pp. 84-85; accord, *Viloski*, at p. 111.) Meanwhile, our Supreme Court has concluded that ability to pay is relevant, and that the following should be considered in determining whether a fine is excessive for purposes of the Eighth Amendment: "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay." (*Lockyer*, *supra*, 37 Cal.4th at p. 728.)

Here, defendant does not argue that approximately $12,000 in fines, fees, and assessments are grossly disproportionate in light of his culpability and the harm he caused in driving with an elevated blood-alcohol level and murdering a family of three. And, the record does not suggest these monetary penalties are ruinous or are so large as to deprive him of his livelihood. (*Timbs*, *supra*, 139 S.Ct. at p. 688.) Accordingly, the fines, fees, and assessments are not excessive under the Eighth Amendment.

## DISPOSITION

The matter is remanded for the court to correct the sentencing minute order and the abstract of judgment to accurately reflect the fines, fees, and assessments imposed by

the trial court.  The court shall forward a copy of the corrected abstract of judgment to the appropriate authorities.  In all other respects, the judgment is affirmed.


DETJEN, J.

WE CONCUR:


HILL, P.J.


SNAUFFER, J.