Filed 2/20/24  P. v. Ferdin CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>FELIX FERDIN,<br><br>Defendant and Appellant. | F084836<br><br>(Super. Ct. No. CR-19-005536)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Nancy A. Leo, Judge.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Driving intoxicated and at a high rate of speed, Felix Ferdin (appellant) drove his car into the side of a residence, killing a mother and her three young daughters.

A jury convicted appellant of four counts of second degree murder (Pen. Code, § 187, subd. (a))[1] and four counts of gross vehicular manslaughter (§ 191.5, subd. (a)). In a bifurcated proceeding, the trial court found appellant suffered a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and a prior serious felony conviction (§ 667, subd. (a)). The trial court sentenced appellant on each murder count to 15 years to life, doubled to 30 years by the strike prior, plus 5 years on each count for the prior serious felony conviction enhancement, for a total sentence of 120 years to life plus 20 years in state prison.

On appeal, appellant contends his murder convictions must be dismissed because there was insufficient evidence he acted with implied malice. We conclude the jury's verdicts were supported by substantial evidence.

However, we agree with appellant that the trial court erred in failing to conduct an evidentiary hearing on his *Sumstine*[2] motion to dismiss his prior conviction for failure to comply with his *Boykin-Tahl*[3] rights. We vacate appellant's sentence and remand the matter to the trial court to conduct an evidentiary hearing, and to resentence appellant.

Appellant also raises several sentencing claims. He argues the trial court abused its discretion in denying his motion to dismiss his prior strike pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) and his motion to dismiss his prior serious felony conviction enhancements pursuant to section 1385, subdivision (b)(1). In addition, he contends the trial court erred in failing to dismiss his prior strike and prior serious felony conviction enhancements pursuant to certain provisions of

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    *People v. Sumstine* (1984) 36 Cal.3d 909 (*Sumstine*).

[3]    *Boykin v. Alabama* (1969) 395 U.S. 238; *In re Tahl* (1969) 1 Cal.3d 122.

section 1385, subdivision (c), which were added by Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1). Because appellant must be fully resentenced, we need not address the merits of these claims. In all other respects, we affirm.

## BACKGROUND

### I. Appellant Drinks Heavily at a Family Barbecue.

Appellant lived with his adult sons Isaiah Ferdin and Felix Villela[4] and their families at a house on Holm Avenue in Modesto. On June 8, 2019, they had a barbecue at their house. Throughout the barbecue, appellant and his sons drank beer and played a drinking game called "beer pong." As the evening progressed and appellant and his sons became more intoxicated, they began to argue and yell. Eventually, Isaiah had to push appellant away from Felix because he thought appellant was going to harm him. Isaiah and appellant then began to argue, and Felix had to separate them. At one point, appellant said, "I'm going to die. I'm going to die soon. I don't care if I die today or tomorrow. I don't care about nobody."

Isaiah testified he had never seen appellant intoxicated before. He did not remember how much appellant drank that evening, but assumed appellant was drunk because they had consumed "heavy alcohol and beer." Felix testified that he and appellant had drunk "a couple of beers" together in the past, but they never drank heavily together like they did that night. Isaiah testified he never knew alcohol to be "an issue" in appellant's life, but knew appellant used to abuse drugs.

### II. Appellant Leaves the Family Barbecue in his Car, Driving at Least 78 Miles Per Hour Down a Residential Street. He Collides Into the Side of a Residence, Killing Four People.

Appellant and his sons continued to argue and yell, and Felix eventually told appellant to leave. Appellant got into his car, a midsize sports utility vehicle that was

---

[4] To avoid confusion, we refer to Isaiah and Felix by their first names. No disrespect is intended.

parked in front of the house. Felix's wife told Felix to try to stop appellant because he was too intoxicated to drive. Felix went outside and told appellant to stop, but appellant kept reversing, scraping the side of a van that was parked next to his car.

Appellant's neighbor testified he heard arguing coming from appellant's house and went outside. He looked toward appellant's house and saw appellant back his car into the street. The neighbor heard a man who lived across the street start yelling and cursing at appellant, accusing him of nearly hitting his car. Appellant's car did not move for one to two minutes, then accelerated westbound on Holm Avenue. The neighbor testified appellant did not stop at the intersection of Holm Avenue and Musick Avenue, which is four houses west of appellant's house. The intersection is controlled by a stop sign. The neighbor estimated appellant was driving 65 to 70 miles per hour. The speed limit on Holm Avenue is 25 miles per hour.

Appellant continued driving westbound on Holm Avenue at a high rate of speed. An officer described this stretch of Holm Avenue as "a fairly narrow street, about 20 feet wide, with cars parked on either side." According to data recovered from the airbag control module on appellant's car, appellant reached speeds of at least 78 miles per hour.

Appellant continued to the intersection of Holm Avenue and Herndon Road. There, Holm Avenue dead ends into Herndon Road, forming a "T" shaped intersection. Westbound traffic on Holm Avenue is controlled by a stop sign.

Surveillance footage of appellant's car traveling through the intersection was admitted into evidence and played for the jury. The camera was facing west along Holm Avenue toward the Herndon Road intersection. At approximately 1:30 a.m., appellant's vehicle entered the view of the camera. The vehicle can be seen travelling at a high rate of speed but with its brake lights on. Appellant's vehicle appeared to decelerate but did not stop at the stop sign at Herndon Road. Instead, it continued through the intersection, striking the cement curb on the opposite side. The vehicle then traveled through a wood fence lining the west side of Herndon Road and crashed into the side of a residence.

4.

Felix heard the collision from his residence and immediately drove to the crash site. When he arrived, he saw appellant get out of his car and come towards him. Felix testified appellant "was out of it." Felix told appellant, "Look what just happened," and appellant replied, "I don't know what you are talking about. I didn't do nothing." When Felix pointed out there were children inside of the residence he had hit, appellant responded, "What children?" Soon after, appellant told Felix that he had been diagnosed with HIV.

At trial, Felix denied physically restraining appellant after the collision. However, in a prior statement to police, he admitted to grabbing appellant by the neck and holding him down on the ground to stop him from leaving the scene.

Police and other emergency personnel responded to the crash site. They discovered appellant's vehicle had travelled through the outside wall of the house and into a bedroom, pushing furniture and other debris up against the back wall. Inside, they located a woman and her three daughters, ages 10, five, and three, all seriously injured from the crash. Despite the efforts of medical personnel, all four victims died from their injuries.

## III.    Driving Under the Influence Investigation.

A California Highway Patrol officer contacted appellant at the scene of the collision. Appellant told the officer he was driving from his home on Holm Avenue. When the officer asked appellant where he was going, appellant responded he "just wanted to get away." Appellant estimated he was driving 20 to 30 miles per hour. However, he admitted he did not stop at the stop sign at Herndon Road because he was traveling too fast, and because he was not paying attention.

While speaking with appellant, the officer observed objective signs of intoxication, including red, watery eyes, slurred speech, and the odor of alcohol coming from appellant's breath and person. The officer asked appellant if he had consumed any

5.

alcohol, and appellant stated he drank three beers plus five small cups of beer while playing beer pong. When asked if he had consumed any other drugs, appellant stated he consumed one line of cocaine. He admitted he was "buzzing" at the time of the crash.

The officer administered several field sobriety tests, including the horizontal gaze nystagmus test, the one-leg stand test, and the walk-and-turn test. Appellant performed poorly on each test, suggesting to the officer that appellant was under the influence of drugs or alcohol. The officer then administered the preliminary alcohol screening device test and obtained readings of .111 percent and .113 percent blood-alcohol content.[5]

The officer placed appellant under arrest, and appellant elected to submit to a breath test. The test was administered at 3:34 a.m., and yielded results of .11 and .10 percent blood-alcohol content. The officer then transported appellant to the hospital, where a sample of his blood was drawn at 5:47 a.m.

Appellant's blood tested negative for cocaine, but positive for benzoylecgonine, an inactive metabolite of cocaine. A criminalist testified the presence of this metabolite in blood indicates cocaine use within 30 to 36 hours. He explained that cocaine leaves of a user's bloodstream within about five hours of ingestion, and that it continues to break down in a blood sample outside of the body. Therefore, it is common for the blood test of a recent cocaine user to show the presence of the metabolite, but not cocaine itself. He also explained that a cocaine user will generally feel its stimulant effects for two to three hours, and the "residual effects" of the drug for another two to three hours.

Appellant's blood also tested positive for methamphetamine. A criminalist testified that methamphetamine can usually be detected in a blood sample for two to three days after ingestion. She also explained that a user generally feels the effects of methamphetamine for four to eight hours after ingestion, followed by a withdrawal effect.

---

[5]     It is unclear from the record when the preliminary alcohol screening device test was administered.

6.

Appellant's blood sample contained a blood-alcohol content of .067 percent. A criminalist explained that the human body eliminates alcohol from the bloodstream at an average rate of .0186 percent per hour. Based on this average rate, the results of appellant's breath tests and blood test, and the times those tests were administered, the criminalist used a process called retrograde extrapolation to calculate appellant's blood-alcohol content at the time of the collision. She estimated that when appellant drove, his blood-alcohol content was approximately .156 percent. The criminalist opined that no person can safely operate a motor vehicle with a blood-alcohol content of 0.08 percent, let alone .156 percent.

A California Highway Patrol sergeant with the Multi-Disciplinary Accident Investigation Team collected electronic data from the airbag control module on appellant's car. The module recorded data at half-second intervals starting at 2.5 seconds before the collision. At the 2.5 second mark, appellant's vehicle was traveling at 78 miles per hour, and the brakes had not been applied. At 2.0 seconds before the collision, the brakes had been applied, and the vehicle had slowed to 70 miles per hour. The vehicle continued to decelerate until it struck the cement curb in front of the victims' residence. The sergeant opined that, based on the rate of deceleration, appellant's vehicle was traveling approximately 45 miles per hour when it hit the curb. He further opined that the vehicle was traveling between 31.9 miles per hour and 36.8 miles per hour when it struck the residence.

## IV.    Defense Evidence.

Appellant called an expert in accident investigation and reconstruction. He measured the distance from appellant's residence to the intersection of Holm Avenue and Herndon Road to be approximately 1,600 feet. He explained the airbag control module showed the brakes on appellant's vehicle were "fully applied" during the two-second

window before the collision. He opined that if appellant had applied his brakes .8 seconds earlier, his car would have stopped before striking the side of the residence.

Appellant called several character witnesses, including two church pastors, and a friend and fellow parishioner. They described appellant as a caring person who actively participated in church activities. Each of the witnesses met appellant around the time he was going through Nirvana, a drug and alcohol treatment center. Appellant was also heavily involved in recovery programs through the church and eventually assumed leadership roles. In Nirvana and the church recovery programs, the participants discussed the dangers of drug and alcohol abuse and addiction.

## DISCUSSION

**I.      The Murder Convictions Were Supported by Substantial Evidence.**

Appellant contends his murder convictions must be dismissed because there was insufficient evidence he acted with implied malice. He relies on various evidentiary factors, such as his lack of prior driving under the influence convictions, and lack of apparent predrinking intent to drive. We disagree. We conclude based on the totality of the circumstances, including appellant's high level of intoxication, extraordinarily dangerous driving, and other conduct before and after the crash, that the jury's finding of implied malice was supported by substantial evidence.

### A.      Standard of review.

"To determine the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains [substantial] evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be

8.

convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Tripp*, *supra*, 151 Cal.App.4th at p. 955, italics omitted.)

### B.   Applicable legal standards.

Murder is the unlawful killing of another with express or implied malice aforethought.  (§§ 187, subd. (a), 188; see *People v. Rangel* (2016) 62 Cal.4th 1192, 1220.)  In *People v. Watson* our high court held that an impaired driver who causes a fatal collision may be guilty of second degree murder if the circumstances demonstrate the driver acted with implied malice.  (*People v. Watson* (1981) 30 Cal.3d 290, 300–301 (*Watson*).)  Malice may be implied where a person deliberately engages in conduct, the natural and probable consequences of which were dangerous to life, knowing the conduct was dangerous and a conscious disregard of that danger.  (*Id.* at p. 300; *People v. Elmore* (2014) 59 Cal.4th 121, 133.)  This is distinct from gross negligence, the mental state for the crime of gross vehicular manslaughter (§ 191.5, subdivision (a)), which instead involves "the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences." (*Watson*, *supra*, 30 Cal.3d at p. 296.)  "Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.'  The state of mind of the person who acts with conscious indifferences to the consequences is simply, 'I don't care what happens.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987–988.)  Thus, unlike gross negligence, "a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved." (*Watson*, *supra*, 30 Cal.3d at pp. 296–297.)  "In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143.)

In *Watson*, the defendant drove himself to a bar, then left after drinking heavily. (*Watson*, *supra*, 30 Cal.3d at pp. 293, 300.) He drove through a red light and avoided a collision with another car by slamming on his brakes. (*Id.* at p. 293.) He then drove away at a high rate of speed, reaching at least 84 miles per hour. (*Id.* at p. 294.) As he approached another intersection, he swerved from one lane into another lane, then suddenly applied his brakes and skidded into the intersection, colliding with another car at approximately 70 miles per hour, killing two people. (*Id.* at pp. 293–294.) Thirty minutes after the collision, the defendant's blood-alcohol content was measured at .23 percent. (*Id.* at p. 294.)

The People filed an information charging the defendant with two counts of second degree murder, but the trial court dismissed the murder counts. (*Watson*, *supra*, 30 Cal.3d at pp. 293–294.) On appeal, the Supreme Court reversed the dismissal, holding the evidence was sufficient to support a finding that the defendant acted with implied malice. (*Id.* at p. 300.) Specifically, the court observed the defendant drank enough alcohol to raise his blood-alcohol content above the legal limit knowing he would have to drive later, drove at high speeds on city streets creating a great risk of harm or death, and was aware of the risk of harm his conduct created, as evidenced by the near collision and his attempt to brake before the fatal collision. (*Id.* at pp. 300–301.)

*Watson* clarified, however, that it was not suggesting the facts of the case "conclusively demonstrate implied malice," but only that the evidence before it was sufficient to uphold the second degree murder charges in the information. (*Watson*, *supra*, 30 Cal.3d at p. 301.) As one appellate court observed, *Watson* does not state "that all of the factors present in that case are necessary to a finding of second degree murder. Rather, the opinion states that the presence of those factors was sufficient *in that case* to support a murder conviction." (*People v. Olivas*, *supra*, 172 Cal.App.3d at p. 988.)

Following *Watson*, appellate courts "have relied upon some or all of the following factors in upholding drunk-driving-murder convictions: (1) a blood-alcohol level above

10.

the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*People v. Talamantes* (1992) 11 Cal.App.4th 968, 973.) Other relevant evidence may include prior driving under the influence convictions (*People v. McCarnes* (1986) 179 Cal.App.3d 525, 532), mandatory driving under the influence related classes (*People v. Murray* (1990) 225 Cal.App.3d 734, 746), and evidence a defendant was warned prior to driving that he or she was too intoxicated to drive. (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1091.)

However, appellate courts recognize that there is no formula used to analyze vehicular homicide cases. Instead, a case-by-case approach is employed. (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 698; *People v. Olivas*, *supra*, 172 Cal.App.3d at p. 989.) Accordingly, appellate courts have upheld numerous murder convictions where defendants have caused death while driving in a variety of different factual circumstances. (See, e.g., *People v. Murray*, *supra*, 225 Cal.App.3d at pp. 746–747 [driving with a blood-alcohol content between .18 and .23 on the wrong side of the freeway]; *People v. Olivas*, *supra*, 172 Cal.App.3d at p. 989 [extremely dangerous driving while under influence of PCP and "negligible" amount of alcohol]; *People v. Moore* (2010) 187 Cal.App.4th 937, 942 [extremely dangerous driving while sober]; *People v. Canizalez* (2011) 197 Cal.App.4th 832, 842 [street racing].)

### C.     *Substantial evidence supported the jury's finding of implied malice.*

In the instant matter, there was ample evidence appellant acted with implied malice. The evidence that appellant drove while highly intoxicated was overwhelming. Investigating officers observed objective signs of intoxication, and appellant admitted to consuming alcohol and ingesting cocaine, and to "buzzing." Appellant's performance on field sobriety tests demonstrated impairment, and the preliminary alcohol screening test and breath tests showed appellant's blood-alcohol content was over the legal limit.

11.

Appellant's blood test revealed a cocaine metabolite, suggesting recent cocaine use. Based on the results of appellant's breath tests and blood test, and the times those tests were administered, the People's criminalist estimated appellant's blood-alcohol content was .156 at the time of the collision—almost twice the legal limit.

Additionally, appellant engaged in extraordinarily dangerous driving. Appellant struck a parked car while backing out of the driveway, and nearly struck another car while backing into the street. He then rapidly accelerated his midsize sports utility vehicle to at least 78 miles per hour over a short distance. While driving at this high rate of speed on a narrow residential street, he ran two stop signs, then collided with a concrete curb, a fence, and eventually the victims' residence. When an officer asked appellant why was unable to stop at the stop sign at Herndon Road, he admitted it was because he was driving too fast and was not paying attention.

Appellant's conduct leading up to and immediately after the crash also demonstrated he drove with a conscious disregard for the safety of others. While arguing with his sons, appellant stated he did not care if he died, and that he did not care about anyone else. He got into the car knowing he was intoxicated, as evidenced by his statement to law enforcement that he was "buzzing." As he backed out of the driveway, he ignored his son, who was telling him to stop because he was too intoxicated to drive. His collision with a parked car as he was backing out gave him notice that he was not able to drive safely. He also ignored his neighbor, who was yelling that he nearly hit his car. Following the collision, appellant's son had to physically restrain him to stop him from leaving the scene, and he exhibited no concern for the victims of the collision.

Appellant contends that despite his high level of intoxication and dangerous driving, there was insufficient evidence he was subjectively aware his conduct was dangerous. He notes that he had no prior convictions for driving under the influence, and never attended a class on the dangers of impaired driving. He also relies on his sons'

12.

testimony that they never saw him drink heavily, which he claims shows he did not understand the impact alcohol would have on his driving.

We are not persuaded. "[A] finding of implied malice in the context of vehicular murder does not require 'a "predicate act" ' such as a prior driving under the influence (DUI) conviction, a DUI-related accident, or a judicial or drug rehabilitation-related admonition of the dangers of driving while intoxicated." (*People v. Murphy* (2022) 80 Cal.App.5th 713, 728.) Thus, while a prior driving under the influence conviction, class, or admonition may constitute evidence of subjective knowledge of the dangers of intoxicated driving, it is not a prerequisite to a finding of implied malice.

The totality of the evidence supported the jury's finding appellant was subjectively aware of the danger his conduct posed. Appellant had previously drunk beers with his son, and thus, was not oblivious to the effects of alcohol. Appellant had a long history of drug abuse and was involved in drug treatment for many years. This included participation in Nirvana, a drug and alcohol treatment center, weekly meetings at a church group for men transitioning to a life of sobriety, and 12-step meetings. In these treatment programs, participants learned about and addressed the dangers of drug and alcohol addiction.

Even assuming appellant was not educated on the dangers of driving under the influence in his drug treatment programs, it strains credulity to suggest he was not subjectively aware of the extreme dangerousness of his driving. In *People v. Moore*, the defendant, who was sober, drove 70 miles per hour on a street with a 35-mile-per-hour speed limit, crossed into the opposing lane of traffic, ran a red light, and struck a car in the intersection, killing a passenger. (*People v. Moore*, *supra*, 187 Cal.App.4th at pp. 939–940.) In finding the defendant's murder conviction was supported by substantial evidence, the court reasoned his actions "went well beyond gross negligence. He acted with wanton disregard of the near certainty that someone would be killed." (*Id.* at p. 941.) Addressing the defendant's claim that the evidence did not establish he was

13.

subjectively aware of the risk his driving posed, the court stated, "Whether Moore was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, Moore was aware of the risk." (*Id.* at p. 941.)

Here, as in *Moore*, appellant's driving was so dangerous that it created a high probability that someone would be killed. Appellant drove at speeds of at least 78 miles per hour on a narrow residential street and ran multiple stop signs. This conduct, combined with his high level of intoxication, was so obviously dangerous that *any* person would be aware of the risk created. Accordingly, the jury's finding that appellant was subjectively aware that his conduct was dangerous to human life, and that he consciously disregarded that danger, was reasonable and supported by the evidence.

We agree with appellant's contention that there was no evidence he intended to drive before he started drinking. Appellant was drinking at home with his family and appears to have left because of the argument with his sons. However, appellant ignored Felix's attempt to get him to stop driving as he backed his car out of the driveway. He also ignored his collision with a parked car, and his neighbor, who yelled at him for nearly hitting his parked car in the street. Despite these warnings that he was too intoxicated to drive safely, he elected to drive off at a high rate of speed, demonstrating a conscious disregard for life.

Next, appellant claims that while there was evidence of cocaine and methamphetamine in his blood, there was no evidence he was actually under the influence of those drugs at the time of driving. According to the criminalists, appellant's blood tests only established that he had used cocaine within 36 hours of the blood draw, and methamphetamine within two or three days. We agree these test results left open the possibility that appellant used cocaine and methamphetamine long enough before the collision that he was not under their influence at the time of driving. However, appellant admitted to the investigating officer that, in addition to drinking alcohol, he had used a

14.

line of cocaine, and was "buzzing," suggesting recent use. Based on this admission and the testimony of the criminalist, the jury could have reasonably inferred appellant was under the influence of cocaine at the time of driving.

Appellant also argues the evidence that he attempted to flee the scene after the collision was irrelevant to his state of mind prior to or during the killing. He relies on *People v. Anderson*, which held the defendant's attempts to cover up a murder by lying to the victim's brother and mother after the murder were irrelevant to whether the murder was premeditated and deliberate. (*People v. Anderson* (1968) 70 Cal.2d 15, 32.)

*People v. Anderson* is inapplicable here because there was no allegation appellant acted with premeditation and deliberation. The only issue before the jury regarding appellant's state of mind at the time of the collision was whether he acted with conscious disregard for life. In making that determination, the jury was entitled to consider his postcollision conduct. (*People v. Ogg* (1958) 159 Cal.App.2d 38, 51.) For example, in *People v. Canizalez*, *supra*, 197 Cal.App.4th at p. 844, the court reasoned the defendants' "callous disregard for the safety of others was no more evident than by their conduct after the crash," including fleeing from the scene, attempting to hide evidence, and demonstrating no remorse or concern. Here, similarly, appellant attempted to flee the scene after the crash and demonstrated no apparent remorse for his victims. These actions supported the conclusion appellant knew his conduct was dangerous but did not care if someone was hurt or killed because of that conduct.

Finally, appellant argues he did not act with implied malice because he stepped on his brakes to try to avoid the collision, and expert testimony established that if he had applied his brakes .8 seconds earlier, his car would have stopped before it struck the residence. These facts do not assist appellant. Regardless of his belated attempt to brake, the fatal collision was the result of his extraordinarily dangerous conduct, including driving 78 miles per hour on a residential street while highly intoxicated. That he attempted to apply the brakes after it was too late to avoid the collision does not negate

15.

his prior conduct. If anything, his attempt to brake suggested "an actual awareness of the great risk of harm which he had created," supporting the conclusion that he acted with conscious disregard for life. (*Watson*, *supra*, 30 Cal.3d at p. 301.)

On review for substantial evidence, our role is to determine whether any rational jury could find appellant guilty beyond a reasonable doubt. (*People v. Tripp*, *supra*, 151 Cal.App.4th at p. 955.) Whether appellant acted with implied malice was an issue for the jury to determine based on the totality of the circumstances, without adherence to any specific formula or factual prerequisites. (*People v. Superior Court (Costa)*, *supra*, 183 Cal.App.4th at p. 698; *People v. Olivas*, *supra*, 172 Cal.App.3d at p. 989.) Based on this record, the jury's finding of implied malice was reasonable. The evidence established appellant was highly intoxicated, drove in an extremely dangerous manner, ignored warnings as he left the house that driving in his intoxicated state would be dangerous, and expressed and demonstrated a lack of concern for the safety of others. While appellant points to specific factors that weighed against a finding of implied malice, such as appellant's lack of prior driving under the influence convictions or predrinking intent to drive, these factors are insufficient to establish the jury's verdict was unreasonable in light of all of the other evidence. Accordingly, our review for substantial evidence reveals that on this record, a rational jury could have found appellant acted with implied malice, and this claim lacks merit.

## II. The Trial Court Erred in Failing to Conduct an Evidentiary Hearing on Appellant's *Sumstine* Motion. We Remand the Matter for the Trial Court to Conduct an Evidentiary Hearing.

In the first amended information, the People alleged appellant was convicted in 2003 of assault with a deadly weapon (§ 245, subd. (a)(1)), which constitutes a prior serious felony conviction (§ 667, subd. (a)) and a strike conviction. (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)

Following trial, appellant filed a *Sumstine* motion to dismiss this prior conviction on the ground that his plea was obtained in violation of his *Boykin-Tahl* rights. The trial court denied the motion without holding an evidentiary hearing.

Appellant and respondent both contend the record supports their respective positions that the motion should have been granted or denied. In the alternative, they both request we remand the matter for the trial court to conduct an evidentiary hearing.

We conclude the record is inadequate to review the merits of the motion, because the trial court was obligated to conduct an evidentiary hearing and allow both parties to present evidence if they so choose. Accordingly, we vacate appellant's sentence, and remand the matter for the trial court to conduct an evidentiary hearing before ruling on the motion.

### A.   *Background.*

Appellant agreed to bifurcation of the prior strike and prior serious felony allegations and waived his right to a jury trial on proof of the allegations. During the court trial, the court admitted certified copies of appellant's California Law Enforcement Telecommunications System (CLETS) rap sheet, the minute order from the date of appellant's prior conviction, and the abstract of judgment for the prior conviction. At the conclusion of the hearing, the trial court found the allegations true.

Prior to sentencing, appellant filed a *Sumstine* motion to dismiss his prior conviction. In support of the motion, appellant attached a declaration alleging that during the plea hearing he was not informed of his rights to confront and cross-examine witnesses, remain silent, or to put on a defense, and that if he had fully been informed of these rights, he does not believe he would have entered the plea. Appellant also submitted a copy of the minute order from his 2003 plea hearing. The minute order contains check-marked boxes indicating he was "advised of" and "waives his Constitutional rights," but does not identify the specific constitutional rights. It also

17.

contains a check-marked box next to the following language: "Court finds Def. has made an intelligent waiver of his rights; plea was freely and voluntarily made; and there is a factual basis for the plea." Appellant also attached a copy of a "CASE CALENDAR REQUEST" form in which he requested a copy of the 2003 plea hearing transcript. The form states the request was denied by the trial court, because the statutory period for the court reporter to maintain her notes had expired, the court reporter stated she no longer has her notes from the hearing, and a copy of the plea transcript no longer appears in the file.

In their written opposition to the motion, the People only stated that if the court reaches the merits of appellant's claim, "the People are entitled to a full hearing on the matter in which Defendant would be subject to cross examination."

At sentencing, the trial court asked defense counsel if he wished to be "heard" on his motion to strike the prior conviction. Defense counsel responded:

> "But I submit to the Court … as to the constitutionality of the prior, I don't believe that it's been proven—that it can be allowed to stand in its present situation.
>
> "If the Court or Counsel wishes to examine my client based upon his declaration that was filed in conjunction with that motion, that's certainly a possibility at this time."

The trial court then asked the People if they would "like to put something on the record relative to [the] motion that [appellant] filed." The People argued appellant failed to establish he was not advised of his constitutional rights during the plea hearing because the minute order stated he was advised of his constitutional rights and waived them. Thus, according to the People, appellant's declaration was "insufficient given the minute order." The People also reiterated that if the court wished to reach the merits of appellant's claim, they would request a full evidentiary hearing.

18.

The trial court denied appellant's motion as follows: "Having considered the moving papers and also the People's response, the Court did find that the prior, the 667 (d) and (a) prior were valid and will not address the constitutionality of that any further on that."

Here, appellant asserts the record was insufficient to establish compliance with his *Boykin-Tahl* rights in the prior plea hearing because the minute order only references "constitutional rights" without identifying the specific rights appellant was advised of and waived. Respondent counters that the minute order is sufficient to show compliance, and the trial court was justified in denying the motion because the only evidence of a *Boykin-Tahl* violation was appellant's "own self-serving statement." Both parties also contend that, at a minimum, the matter must be remanded for the trial court to conduct an evidentiary hearing.

As we explain below, the trial court erred by failing to comply with the Supreme Court's clear directive that an evidentiary hearing must be held once a defendant affirmatively alleges a *Boykin-Tahl* violation. Because neither party had the opportunity to present additional evidence, it would be premature for this court to reach the merits of appellant's motion. Instead, we remand the matter for the trial court to conduct an evidentiary hearing.

### B. The procedural requirements of Sumstine motion.

The California Supreme Court held in *Sumstine* that a defendant may move to strike a prior felony conviction as invalid because the trial court in the prior proceeding failed to comply with the defendant's *Boykin-Tahl* rights. (*Sumstine*, *supra*, 36 Cal.3d at p. 914; *People v. Allen* (1999) 21 Cal.4th 424, 435 (*Allen*).) *Boykin-Tahl* rights refer to the requirement that, before a trial court may accept a defendant's guilty plea, a defendant must be advised of and waive the privilege against self-incrimination, the right to a jury

trial, and the right to confront one's accusers. (See *People v. Mosby* (2004) 33 Cal.4th 353, 359–360.)

The Supreme Court set forth specific procedural requirements for this type of motion in *Sumstine* and reaffirmed them in *Allen*. First, the defendant must "affirmatively allege that at the time of his prior conviction he did not know of, or did not intelligently waive" his *Boykin-Tahl* rights. (*Sumstine*, *supra*, 36 Cal.3d at p. 914.) Once such an allegation is made, the trial court "must hold an evidentiary hearing … to determine the truth of the allegation." (*Ibid*.) "At the hearing, the prosecution bears the initial burden of producing evidence that the defendant did indeed suffer the conviction. The defendant must then produce evidence to demonstrate his *Boykin-Tahl* rights were infringed. The prosecution then has the right to rebuttal, at which point [the prosecution's] reliance on a silent record will not be sufficient." (*Allen*, *supra*, 21 Cal.4th at p. 435.) "At the conclusion of the hearing, the trial court must determine whether the defendant has carried his burden of establishing the constitutional invalidity of the prior conviction by a preponderance of the evidence." (*Curl v. Superior Court* (1990) 51 Cal.3d 1292, 1307.)

In assessing the validity of the prior plea, the trial court's inquiry is not limited to whether the defendant was advised of his *Boykin-Tahl* rights on the record and waived them. (*Allen*, *supra*, 21 Cal.4th at pp. 438–439.) Rather, the trial court must determine whether the plea was intelligent and voluntary because it was given with an understanding of the rights waived. (*Id.* at pp. 439–440.) Accordingly, the trial court must examine "the totality of the circumstances to determine the voluntariness and intelligence of the plea." (*Id.* at p. 440.) For this reason, neither party "is limited to the face of the record in the prior proceeding, but may offer any evidence germane to the defendant's contention he was unaware of his rights when he pleaded in the prior proceeding." (*Id.* at p. 439.)

***C.*** *The trial court was required to conduct an evidentiary hearing on appellant's Sumstine motion. We remand for the trial court to conduct such a hearing, rule on the motion, and resentence appellant.*

In the instant case, appellant's allegation that he was not advised of his *Boykin-Tahl* rights and does not believe he would have entered the plea if he had been fully advised, was sufficient to trigger the evidentiary hearing requirement. (See *Sumstine*, *supra*, 36 Cal.3d at p. 914.) The trial court was then obligated to hold an evidentiary hearing to determine the truth of this allegation. (*Ibid.*) The Supreme Court has made this requirement clear: "When a defendant has made allegations sufficient to justify a hearing, the court *must* conduct an evidentiary hearing." (*Id.* at p. 923, italics added; see *Allen*, *supra*, 21 Cal.4th at p. 439 [trial court is "specifically required" to hold an evidentiary hearing].)

Instead of conducting an evidentiary hearing, the trial court ruled on the motion during sentencing based on the parties' moving papers, appellant's declaration, and the minute order. While the trial court allowed the parties to comment on the merits of the motion, it did not invite them to present additional evidence, despite defense counsel's suggestion that his client testify regarding the allegations in his declaration. This deprived appellant of the ability to produce additional evidence, beyond his initial allegation, to "demonstrate his *Boykin-Tahl* rights were infringed." (*Allen*, *supra*, 21 Cal.4th at p. 435.) Of course, neither party was obligated to produce additional evidence, and was free to submit on the evidence then before the court. But the record does not affirmatively demonstrate the trial court complied with the procedures set forth by the Supreme Court by giving the parties the opportunity to produce additional evidence to meet their respective burdens.

Accordingly, we conclude the trial court erred in failing to conduct an evidentiary hearing on appellant's *Sumstine* motion. Because appellant's sentence was elevated by the prior conviction, we vacate appellant's sentence. The matter is remanded for the trial court to conduct an evidentiary hearing in accordance with the procedure set forth by the

Supreme Court in *Sumstine* and *Allen*. At the conclusion of the hearing, the trial court must determine whether appellant has met his burden of establishing the constitutional invalidity of the plea by a preponderance of the evidence. (See *Allen*, *supra*, 21 Cal.4th at p. 435; *Curl v. Superior Court*, *supra*, 51 Cal.3d at pp. 1303–1306.) After the trial court rules on the motion, it must resentence appellant. We express no opinion on the merits of appellant's *Sumstine* motion, or how the trial court should exercise its discretion upon resentencing.

### III. We Need not Address Appellant's Claims that the Trial Court Abused its Discretion in Denying his *Romero* Motion and Motion to Strike his Prior Serious Felony Conviction Enhancements Because Appellant Must be Resentenced.

Appellant contends the trial court erred in denying his *Romero* motion to dismiss his prior strike conviction and his motion to dismiss his prior serious felony conviction enhancements pursuant to section 1385, subdivision (b)(1). We need not resolve appellant's claims because we have already concluded the matter must be remanded for a full resentencing. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant."].) If appellant so chooses, he may make these motions again during resentencing. We express no opinion how the trial court should resentence appellant or otherwise exercise its sentencing discretion upon remand.

### IV. We Need not Address Appellant's Claims Relating to the Potential Applicability of Senate Bill No. 81 Because Appellant must be Resentenced.

Effective January 1, 2022, Senate Bill No. 81 amended section 1385 to add subdivision (c), which provides, in part:

> "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

"(2)  In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the [listed] mitigating circumstances ... are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."  (§ 1385, subd. (c)(1)-(2).)

Appellant claims the following three enumerated mitigating circumstances listed in section 1385, subdivision (c) are applicable here and warranted dismissal of the prior serious felony enhancements:  section 1385, subdivision (c)(2)(B) provides:  "Multiple enhancements are alleged in a single case.  In this instance, all enhancements beyond a single enhancement shall be dismissed"; section 1385, subdivision (c)(2)(C) provides:  "The application of an enhancement could result in a sentence of over 20 years.  In this instance, the enhancement shall be dismissed"; section 1385, subdivision (c)(2)(H) provides:  "The enhancement is based on a prior conviction that is over five years old."  He also argues that while section 1385, subdivision (c) only references dismissal of enhancements, it also applies to prior strikes.

Respondent agrees Senate Bill No. 81 was effective at the time of appellant's sentencing, but contends appellant forfeited his claims by failing to raise them at sentencing.  Appellant argues the claims were preserved by his *Romero* motion and motion to dismiss the prior serious felony enhancements pursuant to section 1385, subdivision (b)(1).  In the alternative, appellant contends defense counsel's failure to address the applicability of Senate Bill No. 81's amendments at sentencing was ineffective assistance of counsel.

We need not resolve appellant's claims because we have already concluded the matter must be remanded for resentencing.[6]  At resentencing, appellant will have the

---

[6]    While we need not resolve the issues of forfeiture or ineffective assistance of counsel, we agree with respondent that defense counsel did not raise the potential

23.

opportunity to raise claims based on the potential applicability of Senate Bill No. 81's amendments to section 1385. (See *People v. Buycks*, *supra*, 5 Cal.5th at p. 893; *People v. Valenzuela*, *supra*, 7 Cal.5th at pp. 424–425.) Again, we express no opinion how the trial court should resentence appellant or otherwise exercise its sentencing discretion upon remand.

**DISPOSITION**

Appellant's sentence is vacated, and the matter is remanded for the trial court to conduct an evidentiary hearing on appellant's motion to dismiss his prior felony conviction for failure to comply with his *Boykin-Tahl* rights, in accordance with the procedures set forth in *Sumstine*, *supra*, 36 Cal.3d 909 and *Allen*, *supra*, 21 Cal.4th 424. The trial court shall then resentence appellant. Following resentencing, the court shall forward a new abstract of judgment to the appropriate authorities. In all other respects, appellant's judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:


FRANSON, J.


MEEHAN, J.

---

applicability of Senate Bill No. 81's amendments at sentencing. The merits of the claims were not litigated below or addressed by the trial court.