Filed 4/29/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOHN FAY,<br><br>    Defendant and Appellant. | B328209<br><br>(Los Angeles County<br>Super. Ct. No. YA101587) |

APPEAL from the judgment of the Superior Court of Los Angeles County, Nicole C. Bershon, Judge.  Reversed.

Adrian Dresel-Velasquez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Stefanie Yee, Deputy Attorneys General for Plaintiff and Respondent.

_____

Defendant John Fay hit Anthony Davis in the head numerous times. Davis died as a result of the combination of defendant's blows and Davis's intoxication. Defendant admitted that he intended to hurt Davis and inflict pain, but denied that he intended to kill Davis. A jury convicted defendant of second degree murder. (Pen. Code, § 187, subd. (a).)[1] During deliberations, the jury informed the court that it was "deadlocked," the jurors apparently divided as to how to apply the instructions on implied malice.

The court permitted counsel to make supplemental arguments. The prosecutor asserted that a defendant has the mental state for implied malice if he is aware that his conduct is dangerous to others, but does not "care if someone is hurt or killed." When the jurors later asked the court for the "source" of this statement, the court informed them it is based on "case law decisions." Shortly afterward, the jury found defendant guilty of second degree murder. The court sentenced him to prison for 15 years to life.

Defendant contends that the prosecutor's statement regarding the mental state for implied malice is a misstatement of the law, which the court erroneously accepted in its response to the jury's question. We agree. Because the errors are not harmless, we reverse.

### FACTUAL AND PROCEDURAL SUMMARY

#### A.    *The Killing of Anthony Davis*

Between November 2019 and February 2020, defendant was unhoused and living outside a public library. On February 2,

---

[1] Subsequent statutory references are to the Penal Code.

2020, at around noon, he was organizing his possessions in front of the library when Anthony Davis approached him on a bicycle. Davis mumbled something and appeared to be intoxicated. Defendant told him to leave. Davis, however, got off his bicycle and sat on a short cinderblock wall near defendant's possessions. The two exchanged "vulgarities" for several minutes. Davis then attempted to hit defendant with his open hand. After defendant deflected the punches, Davis asked for a "truce," and offered to shake hands. Defendant responded, "Get the fuck outta here."

Davis got on his bicycle and tried to ride away. Defendant, however, "was pissed that [Davis] was about to get away with nothing happening," and pushed Davis off his bicycle. Defendant then punched Davis twice in the head to "send a message" to Davis not to return. Davis then climbed over the cinderblock wall. Although defendant did not fear for his safety at this point, he punched Davis 12 times with his closed fist on both sides of his head. He aimed for Davis's head, he explained, because hits to the head "have the biggest impact in a fight"; he hit Davis on both sides of his head because that made "the pain . . . pervasive," and Davis would "feel it more." Davis covered his face and did not try to fight back. When Davis appeared to be unconscious, defendant left the area.

Davis died at the scene. According to a medical examiner, the cause of death was "concussive/posttraumatic apnea due to blunt head trauma and acute alcohol intoxication."[2]

Defendant told investigating officers that he hit Davis as hard as he could, and that he intended "to hurt" Davis and

---

[2] Except for the statement of the medical examiner, all quoted statements in this part I.A are statements the defendant made to police investigators or while testifying at trial.

"do some damage," not to kill him.  He explained that he "was in a very belligerent mood" and this was "one of the few opportunities [he had] to unleash the venom that's in [him]."

During trial, defendant testified that he intended to inflict "[j]ust enough physical pain so that [Davis] would remember the incident and think twice about coming back to disturb [him], but not enough to kill him."

## B.    *Jury Instructions and Deliberations*

The District Attorney charged defendant with murder. (§ 187, subd. (a).)

The court instructed the jury with CALCRIM No. 520, which states that the defendant can harbor malice aforethought with express or implied malice.  As to implied malice, the instruction states:  "The defendant had *implied malice* if:  [¶] 1. He intentionally committed the act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life."

The jury was further instructed on the lesser offenses of voluntary manslaughter, involuntary manslaughter, and assault with force likely to produce great bodily injury.  (See CALCRIM Nos. 570, 571, 580, 875.)  Under CALCRIM No. 580, the court instructed the jury that "[i]n order to prove murder or voluntary manslaughter, the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to kill or with conscious disregard for human life.  If the People have not met either of these burdens, you must find the defendant not guilty of murder and not guilty of voluntary manslaughter."

4

After deliberating less than two hours, the jury submitted the following question regarding the implied malice instruction: "[I]s there any other written definition or guidance pertaining to the definition of 'dangerous to human life'?  Does that mean the act was likely to result in death?"

With the agreement of counsel, the court provided the following response in writing to the jury:  "All the definitions that you will be provided are already contained in the jury instructions you received."  Later that day, the jury requested 12 copies of the jury instructions, which the court provided.

After further deliberations, the jury informed the court that after three votes they were "deadlocked" and "unable to reach a verdict."  The jury foreperson informed the court that on each vote the jurors had split seven to five.  The jury foreperson suggested that it might help to have the court reread the jury instructions.  The court did so.

Outside the presence of the jurors, the prosecutor requested that counsel give further arguments to the jury on the implied malice instruction.  Defense counsel responded, "I don't think so. I will submit."

After rereading the jury instructions and further deliberations, the jury foreperson submitted the following question regarding the implied malice instruction:  "Under [CALCRIM No.] 520.  [The definition of] implied malice . . . states[,] 'The natural and probable consequences of the act were dangerous to human life[.]'  [¶]  Can it be clarified that the statement is saying what it says, 'DANGEROUS to human life[,]' not death or leading to death."  The foreperson told the court further:  "For me I am reading it as it's stated that it's dangerous

5

to human life.  But there's other interpretations of it that it is leading to death or causing death."

The court responded by informing the jurors that they "can't insert additional language [into an instruction] that isn't there."  They "have to apply the instructions as they're worded to the facts as [they] heard them."  The court stated further: "The language is what the language is.  So the language is the natural and probable consequences of the act were dangerous to human life. . . . Then there's a definition later on, what is natural and probable consequences?  An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  The natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.  And [part two of the definition of implied malice] says the natural and probable consequences of the act were dangerous to human life.  That's the language that you have to follow."

After the readback of certain witness testimony, the jury deliberated further.  After a fourth vote, a juror informed the court that they remained split at seven to five, and "[n]obody is changing their mind."  The court informed the jurors that they should return the next morning and, if they are still deadlocked, the court will permit counsel to address them.

The next morning, the jury deliberated further and took a fifth vote, then informed the court that they remained "deadlocked" and "unable to reach a verdict."  In the afternoon, the jury again informed the court that it was "unable to reach a conclusion."

Over defendant's objection, the court allowed counsel to present supplemental argument. The prosecutor argued that proving that an act is "dangerous to human life" does not require the prosecution to prove "that the act is likely to cause death." Regarding the mens rea element of implied malice, the prosecutor argued that, "in everyday language," acting "with conscious disregard for human life" means: "I know my conduct is dangerous to others, but I don't care if someone is hurt or killed. [¶] What you [the jurors] may be trying to do is say[,] I don't care if someone is killed. That's not the standard. The standard for this charge is[,] I don't care if someone is hurt or killed." The prosecutor then applied this standard to the evidence: Defendant "didn't care that Anthony Davis was hurt. He didn't care."

Defense counsel did not interpose an objection during the prosecutor's argument.

In defense counsel's supplemental argument, counsel did not disagree with the prosecutor's assertions concerning the meaning of "dangerous to human life" or "conscious disregard for human life." Instead, he argued that the prosecution had failed to meet its burden of proof to establish murder, and that defendant "is responsible . . . for an involuntary manslaughter."

After deliberating further for about one hour, the jury asked the following question: "During today's [supplemental argument,] the People used a quote in the support of clarifying the criteria under implied malice, specifically, . . . 'I don't care if someone is hurt or killed.' The point was to highlight the *or* and that being hurt, not just killed, is enough. What was the source of that quote?" (Italics added.)

Out of the jury's presence, the prosecutor told the court that the questioned language is derived from *People v. Olivas*

7

(1985) 172 Cal.App.3d 984 (*Olivas*).  In *Olivas*, the Court of Appeal addressed the difference between second degree implied malice murder, which requires that the defendant act with " 'conscious disregard for life,' " and vehicular manslaughter, which requires " 'conscious indifference to the consequences.' [Citation.]" (*Id*. at p. 987, quoting *People v. Watson* (1981) 30 Cal.3d 290, 296 (*Watson*).)  The *Olivas* court stated:  "Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.'  The state of mind of the person who acts with conscious indifferences to the consequences is simply, 'I don't care what happens.' " (*Id*. at pp. 987–988.)

The court in this case noted that this "hurt or killed" language in *Olivas* had been recently restated in *People v. Murphy* (2022) 80 Cal.App.5th 713, 726 (*Murphy*).  The court stated that the prosecutor did not misstate the law, but expressed concern that the prosecutor had not given the court and defense counsel notice that it would be relying on the *Olivas* language.

Defense counsel explained that he did not object during argument to the prosecutor's statements because he "was hoping that [the jurors] would just pass over it," and "was going to let everything slide."  After some colloquy among the court and counsel, however, defense counsel moved for a mistrial based on "improper argument" and "prosecutorial misconduct."  Although defense counsel did not assert that the prosecutor inaccurately stated the law, he argued that "it was misleading."

After conferring with counsel, the court responded to the jury as follows:  "The statement of the attorney came from case

8

law decisions and you are reminded that arguments of counsel are not evidence."

Less than one hour later, the jury announced they had reached their verdict:  Guilty of murder in the second degree.

## DISCUSSION

Defendant contends that the prosecutor misstated the law when he argued that defendant acted with the requisite "conscious disregard" if he did not "care if someone is hurt or killed," and that the court erroneously "supported this argument" when it informed the jury that the prosecutor's statements came "from case law decisions."  These errors, defendant argues, improperly allowed the jury to convict defendant on the invalid theory of implied malice.  We agree.[3]

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  Malice may be express or implied.  (§ 188.)  It "is implied when the killing is proximately caused by ' " an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 152 (*Knoller*).)

In *Knoller*, our Suprme Court reviewed a Court of Appeal's decision stating that a conviction of implied malice

---

[3] The Attorney General argues that defendant forfeited the claims defendant asserts on appeal because he failed to timely object on the same grounds asserted on appeal.  We elect to address the issues, however, because they involve instructional errors and implicate substantial rights of the defendant, including rights to a fair trial and due process. (§ 1259; *People v. Johnson* (2015) 60 Cal.4th 966, 993.)

9

murder could be upheld "if the defendant knew his or her conduct risked causing death *or serious bodily injury*." (*Knoller*, *supra*, 41 Cal.4th at p. 143.) Our Supreme Court reversed. It is "well settled," the court explained, that "a killer acts with implied malice only when acting with an awareness of *endangering human life*." (*Id.* at p. 153.) Thus, "implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Id.* at p. 143; accord, *People v. Cravens* (2012) 53 Cal.4th 500, 507.)

The written instructions given to the jury in the instant case—including CALCRIM Nos. 520 and 580—correctly express this rule, requiring the prosecution to prove that the defendant acted with "conscious disregard for human life." (CALCRIM Nos. 520, 580; see *Knoller*, *supra*, 41 Cal.4th at p. 152 [CALCRIM No. 520 includes " 'the straightforward language of the "conscious disregard for human life" definition of implied malice' "]; *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1092 (*Johnigan*) [CALCRIM No. 520 is an accurate statement of the law].)

The prosecutor's statement that the "standard for [the murder] charge is[,] I don't care if someone is hurt or killed," cannot be reconciled with the "conscious disregard for human life" standard established in *Knoller*. The prosecutor's statement implies that the mens rea for implied malice would be satisfied if the defendant acted with conscious disregard for harming another. In *Knoller*, the Supreme Court held that the Court of Appeal's standard, which could be satisfied when the defendant is aware "of the risk of causing *serious bodily injury* to another" (*Knoller*, *supra*, 41 Cal.4th at p. 153) "set the bar too low" (*id.* at p. 143). Here, the prosecutor set the bar even lower; it was

10

apparently enough for the defendant merely to be aware that he could "hurt" someone, even without causing serious bodily injury.

In support of his statement, the prosecutor relied on *Olivas*, *supra*, 172 Cal.App.3d 984. In that case, the defendant was driving a car under the influence of phencyclidine and being chased at high speeds by police officers when he ran a stop sign and collided with a car, killing an infant in the other car. (*Id.* at p. 986.) A jury convicted him of murder, and he appealed, challenging the sufficiency of the evidence. In discussing the distinction between vehicular homicide and murder, the *Olivas* court discussed *Watson*, *supra*, 30 Cal.3d 290, stating: "The Supreme Court [in *Watson*] explained that a vehicular homicide committed while intoxicated involves implied malice, and is thus second degree murder, if 'a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life.' [Citation.] The homicide is vehicular manslaughter if committed with gross negligence, which is 'the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences.' [Citation.] [¶] The distinction between 'conscious disregard for life' and 'conscious indifference to the consequences' is subtle but nevertheless logical. Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' The state of mind of the person who acts with conscious indifferences to the consequences is simply, 'I don't care what happens.' It makes sense to hold the former more culpable than the latter, since only the former is actually aware of the risk created." (*Olivas*, *supra*, 172 Cal.App.3d at pp. 987–988.) The court concluded that the evidence

11

was sufficient to support the murder conviction because the defendant's actions leading up to the fatal collision demonstrated that he "was acting deliberately with conscious disregard for a known, life-threatening risk." (*Id.* at p. 989.)

The *Olivas* court did not cite any authority for the statement: " 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " (*Olivas*, *supra*, 172 Cal.App.3d at p. 988.) Moreover, the statement was dictum in that case because the court based its conclusion on its determination that defendant acted "with conscious disregard for a known, life-threatening risk" (*id.* at p. 989), not because the defendant acted with conscious disregard for whether someone could be hurt.

The "hurt or killed" language in *Olivas* has been repeated or referred to by numerous Courts of Appeal, both before and after *Knoller*. (See, e.g., *People v. Suazo* (2023) 95 Cal.App.5th 681, 692; *Murphy*, *supra*, 80 Cal.App.5th at p. 726; *People v. Tseng* (2018) 30 Cal.App.5th 117, 129; *People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358; *People v. McNally* (2015) 236 Cal.App.4th 1419, 1426; *Johnigan*, *supra*, 196 Cal.App.4th at pp. 1091–1092; *People v. David* (1991) 230 Cal.App.3d 1109, 1114; *People v. Murray* (1990) 225 Cal.App.3d 734, 746; *People v. Brogna* (1988) 202 Cal.App.3d 700, 708.) In each of these cases, the suggestion, if made at all, that implied malice could be supported by evidence that the defendant acted merely with conscious disregard that someone could be "hurt" was dictum. Because the dictum is contrary to our Supreme Court's holding in *Knoller*, we reject it.

The court here compounded the prosecutor's error when, in response to the jury's question as to the source of the statement,

12

it informed the jury that it is based on "case law decisions." The court's response effectively endorsed the prosecutor's misstatement and gave it the force of law on a par with the formal instructions the jury had received. The combination of the prosecutor's misstatement and the court's endorsement of that misstatement allowed the jury to apply an incorrect legal principle to the evidence and convict defendant on an invalid theory of law.

The errors are not harmless under any standard. After several votes among the jurors, they were nearly evenly split and "deadlocked," with no one "changing their mind." Based upon the questions jurors posed to the court and the statements made by the jury foreperson, it appears that the jurors were divided on the nature of implied malice. In particular, they appeared to disagree as to the degree to which the defendant's actions must endanger the victim's life. Notwithstanding the written instructions that correctly required the defendant's acts be "dangerous to human life," and that the defendant act "with conscious disregard for human life," the jurors were eventually told by the prosecutor that it is enough that the defendant act without caring that someone is "hurt," a standard that the court informed them was grounded in "case law decisions." With this new instruction and the evidence of defendant's admissions that he intended "to hurt" Davis and cause him "physical pain," jurors who had theretofore refused to find defendant acted with malice now found themselves without legal ground to maintain their position. Thus, a deadlocked seven-five split turned into a unanimous guilty verdict within one hour of the court's response to the jury's last question. The prejudice is unmistakable. Accordingly, the judgment is reversed.

13

**DISPOSITION**

The judgment is reversed.

<u>CERTIFIED FOR PUBLICATION</u>.


ROTHSCHILD, P. J.

We concur:



CHANEY, J.



WEINGART, J.


14